# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Linda Hoekman, Mary Dee Buros, and Paul Hanson, on behalf of themselves and others similarly situated, | Case Nos. 18-cv-01686 & 18-cv-02384 (SRN/ECW) |
| Plaintiffs, | **JOINT MEMORANDUM OPINION AND ORDER ON CLASS CERTIFICATION AND *DAUBERT* MOTIONS** |
| v. | |
| Education Minnesota, Anoka Hennepin Education Minnesota, National Education Association, American Federation of Teachers, and Shakopee Education Association, | |
| Defendants. | |
| Thomas P. Piekarski and Jayme Prokes, on behalf of themselves and others similarly situated, | |
| Plaintiffs, | |
| v. | |
| AFSCME Council No. 5, | |
| Defendants. | |

Douglas P. Seaton, Upper Midwest Law Center, 8421 Wayzata Boulevard, Suite 105, Golden Valley, MN 55426; James V. F. Dickey, Hellmuth & Johnson, PLLC, 8050 West 78th Street, Edina, MN 55439; Jonathan Franklin Mitchell, Mitchell Law PLLC, 111 Congress Avenue, Suite 400, Austin, TX 78701; and Talcott Franklin, Talcott Franklin PC, 1920 McKinney Avenue, Seventh Floor, Dallas, TX 75201, for all Plaintiffs.

Amanda C. Lynch, Danielle Leonard, Patrick C. Pitts, and Scott A. Kronland, Altshuler Berzon LLP, 177 Post Street, Suite 300, San Francisco, CA 94108; and Cedrick Frazier, David Aron, and Margaret A. Luger-Nikolai, Education Minnesota, 41 Sherburne Avenue, Saint Paul, MN 55103, for Education Minnesota *et. al.* Defendants.

April Pullium, Georgina Yeomans, Jacob Karabell, John M. West, Leon Dayan, and Ramya Ravindran, Bredhoff & Kaiser, PLLC, 805 Fifteenth Street NW, Suite 1000, Washington, D.C. 20005; and Joshua Hegarty, AFSCME Council 5, 300 Hardman Avenue South, South Saint Paul, MN 55075, for AFSCME Council No. 5.

SUSAN RICHARD NELSON, United States District Judge

These matters come before the Court on Plaintiffs' Motions for Class Certification (18-cv-01686 (henceforth, the *Hoekman* matter) [Doc. No. 91] and 18-cv-02384 (henceforth, the *Piekarski* matter) [Doc. No. 58]) as well as Defendants' American Federation of State, County, and Municipal Employees, Council No. 5 and Education Minnesota *et. al.*'s (henceforth "AFSCME," "Education MN Defendants", or collectively "Defendants") Motions to Exclude Expert Testimony (18-cv-01686 [Doc. No. 101]; 18-cv-02384 [Doc. No. 72].)  For the following reasons, the Court **DENIES** both Motions for Class Certification, and **GRANTS IN PART** and **DENIES IN PART** Defendants' Motions to Exclude Expert Testimony.

## I.     BACKGROUND

Plaintiffs in both matters bring class action complaints against two Minnesota labor unions and their affiliate organizations.[1]  (*See* 18-cv-1686, Hoekman Am. Compl. [Doc. No. 35]; 18-cv-2384, Piekarski 2d Am. Compl. [Doc. No. 40].)  The Plaintiffs in the first case, *Hoekman et. al. v. Education Minnesota et. al.*, are current or former Minnesota

---

[1]     Counsel for plaintiffs in both cases are the same.  Moreover, both the *Hoekman* and *Piekarski* matters are related to another federal case pending in the Southern District of Ohio, *Littler v. Ohio Association of Public School Employees*, No. 2:18-cv-1745 (GCS/CMV), 2020 WL 1861646 (S.D. Ohio Apr. 14, 2020).  All three cases involve the same plaintiffs' expert, Dr. David A. Macpherson, who was jointly deposed by defendants from all three cases.  (*See* Yeomans Decl. (18-cv-02384) [Doc. No. 75-3] at 4 (stipulating to joint use of Macpherson's deposition in the *Hoekman*, *Prokes* (referred to here as *Piekarski*) and *Littler* cases); *see also* Macpherson Dep. Tr. (18-cv-02384) [Doc. No. 75-1] at 7 (noting Macpherson deposition was jointly conducted for all three cases).)  The *Littler* court recently denied a nearly identical class certification motion from the plaintiff, and granted in part a nearly identical motion to exclude Dr. Macpherson's expert opinion. *See generally Littler*, 2020 WL 1861646.

public school teachers who filed suit against Education Minnesota, a Minnesota labor union headquartered in Saint Paul, Minnesota (*see* Hoekman Am. Compl. ¶ 12) and its affiliates, including the National Education Association and the American Federation of Teachers, (*Id.* ¶¶ 13–16.)  The Plaintiff in the second case, *Piekarski v. AFSCME Council No. 5*, is a Minnesota public employee who filed suit against Council No. 5 of the American Federation of State, County, and Municipal Employees (AFSCME), also a Minnesota labor union headquartered in Shakopee, Minnesota.  (Piekarski 2d Am. Compl. ¶ 5.)

The plaintiffs in each case seek declaratory and monetary relief for themselves and on behalf of those similarly situated because they contend that each union previously illegally required, as a condition of employment, that plaintiffs either join their respective union and pay membership dues, or decline to join and instead pay "agency" or "fair share" fees, a financial payment consisting of a smaller percentage of full membership dues.  (*See* Hoekman Am. Compl. at p. 1–3; Piekarski 2d Am. Compl. ¶ 11; *see also* Henderson Dep. Tr. (as 30(b)(6) deponent for AFSCME Council 5) [Doc. No. 62-2] at 9.)

### A.    The Parties

#### 1.    Hoekman Case

In the *Hoekman* matter, the current named plaintiffs are Linda Hoekman, Mary Dee Buros, and Paul Hanson.[2]  (Hoekman Am. Compl. ¶¶ 3, 5, 8.)  Linda Hoekman is a public-school teacher who has worked for the Anoka Hennepin School District since 1997.  (*Id.*

---

[2]    The *Hoekman* matter was originally brought by nine plaintiffs, but six dismissed their claims, leaving only Hoekman, Buros, and Hanson.  (*See* Hoekman Am. Compl. ¶¶ 4, 6–7, 9–11); *see also* Order Dismissing Several Hoekman Pls. [Doc. No. 78].)

¶ 17)   While she is unsure of the precise date, Hoekman joined the Anoka Hennepin Education Association—her local Education Minnesota affiliate and exclusive bargaining representative for teachers in her district—as a dues-paying member sometime before 2006.  (Hoekman Dep. Tr. [Doc. No. 95-3] at 71–72, 89–90, 97.)   In or about 2006, Hoekman resigned her membership and switched to paying "fair share" fees until the Supreme Court's decision in *Janus*, discussed below.  (*Id.* at 97–98, 110.)

Plaintiff Mary Dee Buros is a public-school teacher who has worked for the Shakopee Public Schools since 1997.  (Hoekman Am. Compl. ¶ 30; Buros Dep. Tr. [Doc. No. 95-5] at 27.)  Buros joined the Shakopee Education Minnesota Association—her local Education Minnesota affiliate and exclusive bargaining representative for teachers in her district—when she began her employment and remained a member until the Supreme Court's ruling in *Janus*, resigning on August 3, 2018.  (Hoekman Am. Compl. ¶ 30.)

Plaintiff Paul Hanson is a public-school teacher who has worked for the Centennial School District in Circle Pines, Minnesota since January 2005.  ((*Id.* ¶ 19; Hanson Dep. Tr. [Doc. No. 95-4] at 19–20, 23.)  Hanson is exclusively represented by Centennial Education Minnesota, the local Education Minnesota representative for his district.  (Hanson Dep. Tr. at 58–59.)  Hanson has never joined a union, and instead was a "fair share" fee payer until, as noted below, the Supreme Court ruled such fees unconstitutional.  (*Id.* at 14.)

The Hoekman plaintiffs sued five entities, all unions or union affiliates.  Defendant Education Minnesota is a labor union headquartered in Saint Paul, Minnesota.  (Hoekman Am. Compl. ¶ 12; Education MN Defs.' Answer to Am. Compl. (Education MN Defs.' Answer) [Doc. No. 50] ¶ 12.)   Education Minnesota is a statewide union for public

4

education employees and is affiliated with the National Education Association and the American Federation of Teachers. (Education MN Defs.' Opp'n Mem. to Mot. to Certify Class (Education MN CC Opp'n Mem.) [Doc. No. 107] at 4.)

Plaintiffs also sued two local union chapters associated with Education Minnesota. The first, Defendant Anoka Hennepin Education Minnesota, is a local union chapter based out of Minneapolis, Minnesota. (Hoekman Am. Compl. ¶ 13.) The second, Defendant Shakopee Education Association, also a local union chapter, is based out of Shakopee, Minnesota. (*Id.* ¶ 14; *see also* Education MN Defs.' Answer ¶¶ 13–14.)

Finally, Plaintiffs sued two national labor unions affiliated with Education Minnesota. The first, Defendant National Education Association (NEA) is a labor union headquartered in Washington D.C. (Hoekman Am. Compl. ¶ 15.) The second, Defendant American Federation of Teachers (AFT), is also a labor union headquartered in Washington D.C. (*Id.* ¶ 16; *see also* Education MN Defs.' Answer ¶¶ 15–16.)

## 2.    Piekarski Case

In the *Piekarski* case, the sole remaining named plaintiff is Thomas Piekarski. (Piekarski 2d Am. Compl. ¶ 4.) Piekarski is employed by the Minnesota Department of Transportation and works in a bargaining unit represented by AFSCME Council 5, Local 221. (*Id.* ¶ 10.) He joined AFSCME Local 221 in May of 2009, and eventually served as its president in 2015 for about a month and a half. (Piekarski Dep. Tr. [62-3] at 25–27, 38, 44.) In 2017, Piekarski's support for the union changed and he sought to discontinue union membership. (*Id.* at 52.) In August of 2018, his union dues ceased. (*Id.* at 62.)

Piekarski[3] has sued Defendant AFSCME, Council 5, a labor union headquartered in South Saint Paul, Minnesota.  (*Id.* ¶ 5.)  AFSCME primarily represents public-sector employees throughout Minnesota.  (AFSCME Council 5 Opp'n Mem. to Motion to Certify Class (AFSCME CC Opp'n Mem.) [Doc. No. 70] at 2.)

### B.   Factual Background

#### 1.   Supreme Court Precedent on Union Fair Share Fees

About 43 years ago, in *Abood v. Detroit Board of Education*, 431 U.S. 209, 236–36 (1977), the Supreme Court held that public-sector unions may collect compulsory "agency fees"—also known as "fair share" fees—from nonmembers within a bargaining unit to fund activities that are germane to collective bargaining, but may not use those fees to fund non-germane political or ideological activities that a nonmember employee opposes.  The Court later explained in *Chicago Teachers Union, Local No. 1. v. Hudson* that the procedure the unions use to distinguish between the use of funds collected from dues-paying members and "agency fee" payers must "be carefully tailored to minimize the infringement" of a nonmember's First Amendment rights.  475 U.S. 292, 303 (1986).

On June 27, 2018, in *Janus v. AFSCME, Council 31*, the Supreme Court overruled *Abood* and held that public-sector unions may no longer deduct agency fees or "any other

---

[3]     Much like the *Hoekman* case, certain of the original named plaintiffs in *Piekarski* are no longer part of the case.  The original named plaintiff, Jayme Prokes, abandoned the suit at some point in 2019.  (*Compare* Original Prokes Compl. [Doc. No. 1] at 1 (listing Prokes as sole named plaintiff), *with* Piekarski 2d Am. Compl. at 1 (listing only Piekarski as named plaintiff); *see also* AFSCME CC Opp'n Mem. at 5.)  Another named plaintiff that was added later, Randall Eason, subsequently settled his claims.  (*See* Eason Stip. For Dismissal [Doc. No. 54].)

payment to the union" from the wages of nonmember employees unless the employees waive their First Amendment rights by "clearly and affirmatively consent[ing] before any money is taken from them."  138 S. Ct. 2448, 2460, 2486 (2018).

### 2.    Plaintiffs' Experiences With Their Respective Unions

#### a.    Hoekman Case

Hoekman joined the Anoka Hennepin Education Association as a dues-paying member sometime before 2006.  (Hoekman Dep. Tr. at 71–72, 89–90, 97.)  In or about 2006, Hoekman's desire to remain a union member changed; beginning in 2006 and continuing until the Supreme Court's decision in *Janus* in 2018, Hoekman was a "fair share" fee payer.  (*Id.* at 23, 44–45.)  Hoekman cannot recall the precise reason that she switched from being a dues-paying member to fair share fee payer, and acknowledges that her opinions about the union have changed over the course of her career based on the information available to her each time she made a decision related to the union.  (*Id.* at 110, 118–120.)  Currently, she believes that union salaries are too high for low-level officials, and disagrees with some—but not all—of Education Minnesota's political and practical educational positions.  (*Id.* at 132–34, 141, 146.)  Hoekman is seeking a refund of fair share fees that she paid to her union against her will.  (*Id.* at 50.)

Buros joined the Shakopee Education Minnesota Association in 1997 and remained a member until the Supreme Court's ruling in *Janus*, resigning on August 3, 2018. (Hoekman Am. Compl. ¶ 30.)  She explained she joined the union because, she asserts, she was not given the option to be a "fair share" fee payer; accordingly, she believed she had no choice in the matter.  (Buros Dep. Tr. at 31–32, 45–46.)  She held that opinion for all

22 years of her employment, although now acknowledges that she did have a choice to not join the union. (*Id.* at 57.) Buros disagrees with money being taken from her paycheck against her will, and asserts that she was never told how the money provided to the union was being spent. (*Id.* at 32.) She seeks a refund of at least some of the dues she paid to the union. (*Id.* at 32, 132–33.) Buros acknowledges that whether to join a union is a personal decision, and she cannot say what her fellow teachers would have done, in retrospect, if they had had the option to choose between being a dues-paying member or paying nothing and being a nonmember. (*Id.* at 122.)

Despite working in the Centennial School District since 2005, Hanson has never been a member of any union and remained a "fair share" fee payer within Centennial Education Minnesota until *Janus* ruled such fees unconstitutional. (Hanson Dep. Tr. at 14, 58–59.) From the beginning of his employment, Hanson acknowledges that his decision to be a fair share fee payer, and not a union member, was a choice that resulted in less money being deducted from his paycheck, although he contends that the choice is illusory because either way you have to pay something. (*Id.* at 49, 73.) While Hanson acknowledges that even as a fair share fee payer, he benefits from pay raises negotiated by the union, his disagreement with the union stems from his opinion that, among other things, the organization is too politicized and "shouldn't be involved in politics at all." (*Id.* at 69, 88.) He does acknowledge that his own reasons for not joining the union have changed over the years, and that there is no way he could know what information any other teachers had or considered at the time they made the choice to join or not join the union. (*Id.* at 75, 77.) He also cannot state with certainty that, if he had been given the choice to pay nothing

and still benefit from the union's representation, he would have made that choice.  (*Id.* at 120.)  To the contrary, he testified that if that choice had been available, he "probably" would have still chosen to pay something to the union because otherwise he would have been uncomfortable with the union negotiating on his behalf for free.  (*Id.* at 120–21.)

### b.      Piekarski Case

Piekarski joined AFSCME Local 221 in May of 2009, and eventually served as president of Local 221 in 2015 for about a month and a half.  (Piekarski Dep. Tr. at 25–27, 38, 44.)  In 2017, Piekarski's support for the union changed and he sought to discontinue union membership.  (*Id.* at 52.)  In August of 2018, he ceased paying union dues.  (*Id.* at 62.)  Piekarski is seeking to recoup union dues that were taken out of his paycheck after he initially decided to resign from the union in October 2017, as well as union dues he paid following his resignation as president of Local 221.  (*See id.* at 17, 22–23.)  He views his lawsuit as an effort to "[f]ix this union problem," and stop the union from wasting money and misusing union dues.  (*Id.* at 21.)  During the pendency of this lawsuit, the union did offer him a refund of at least a portion of his dues, but he declined to cash the check, instead choosing to remain in the lawsuit to represent anyone similarly situated.  (*Id.* at 87–88.)  He acknowledges, much like the other plaintiffs in these cases, that everyone has their own reasons to join, or not join, their respective union.  (*Id.* at 59.)

### C.      Procedural History

The *Hoekman* case was originally filed on June 18, 2018.  (*See* Hoekman Original Compl. [Doc. No. 1].)  The complaint was subsequently amended on October 1, 2018.  (*See* Hoekman Am. Compl.)  It seeks "redress for the defendants' past and ongoing violations

of [plaintiffs'] constitutionally protected rights," specifically Education MN Defendants' decision to force the Hoekman plaintiffs—and the individuals they seek to represent—to pay compulsory "fair share" fees to Education Minnesota or its affiliates as a condition of their employment.  (*Id.* at p. 1)  The Hoekman plaintiffs originally sued on behalf of three separate classes:  (1) a "fair share fee payers" class consisting of employees who refused to join Education Minnesota or its affiliates but were compelled to pay "fair share fees"; (2) a second class consisting of current and former union members who "would have quit Education Minnesota or its affiliates had they not been compelled to work in an unconstitutional agency shop"; and (3) a third class consisting of former Education Minnesota members who "sought to terminate union-related payroll deductions in the wake of *Janus*—but who have been thwarted from doing so by the union or by their employer." (*Id.* at p. 2.)  The Hoekman plaintiffs assert that the injury suffered by each class member is a violation of their First Amendment rights as set forth in *Janus*.[4]  (*Id.* ¶¶ 23, 35, 48.)

The *Piekarski* case was originally filed on August 14, 2018.  (*See* Piekarski Original Compl. [Doc. No. 1].)  The complaint was subsequently amended on May 25, 2019.  (*See* Piekarski 2d Am. Compl.)  Piekarski, the only remaining plaintiff in the suit, seeks redress for purported past and ongoing violations of his constitutional rights by AFSCME Council 5, which he asserts took the form of compelled fair share fees and/or union membership dues.  (Piekarski 2d Am. Compl. ¶ 44.)  Piekarski seeks to represent a class of "all public employees who were compelled to subsidize AFSCME Council 5 or its affiliates on

---

[4]     Plaintiffs also asserted several state law claims, but have not sought class certification on those claims.  (Hoekman Am. Compl. ¶¶ 26, 38, 49.)

account of [its] unconstitutional agency-shop arrangements." (*Id.* ¶ 54.) According to his complaint, that class includes:

> (1) non-members of AFSCME Council 5 who were compelled to pay "fair-share fees" to the union; (2) employees who opposed payments to the union but who reluctantly joined because they decided that the difference between the cost of full membership dues and mandatory "fair-share fees" would not have been worth the loss of their voice and vote in collective-bargaining matters; (3) employees who opposed payments to the union but who joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in "fair-share fees;" and (4) any other public employee who was offered membership in AFSCME Council 5 while working in an agency shop.

(*Id.* ¶ 54.) Alternatively, if the above class is not certified, Piekarski indicated his intent to seek certification of a class that consists of only the first three aspects of the above class. (*Id.* ¶ 55.)

Piekarski also indicated his intent to seek certification of a class of "all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time after *Janus*: (1) informed the union that they wished to terminate their union membership or the payroll deduction of union fees; and (2) had union fees diverted from their paycheck after informing the union of their desired to terminate their union membership or halt the diversion of union fees" as well as a class of the same employees who "at any time before *Janus*: (1) informed the union that they wished to terminate their union membership or switch to payment of 'fair-share fees'; and (2) whose instructions were not promptly

honored or implemented, retroactive to the date on which they first informed the union that they longer wished to pay full membership dues."[5]  (*Id.* ¶ 63, 67.)

### D.   The Present Motions

#### 1.   Class Certification Motions

On October 18, 2019, both the Hoekman Plaintiffs and Piekarski moved for class certification under Federal Rule of Civil Procedure 23(b)(3).  (*See* Hoekman Pls.' Mot. for Class Certification (Hoekman CC Mot.) [Doc. No. 91]; Piekarski Mot. for Class Certification (Piekarski CC Mot.) [Doc. No. 58].)  The classes proposed by plaintiffs have changed since their complaints were filed.

The Hoekman plaintiffs now move to certify two classes.  (Hoekman CC Mot. at 1.) The first, labeled the "Agency Shop Class," is represented by Hoekman, Hanson, and Buros, and consists of "every public employee who was offered membership in Education Minnesota or its affiliates while working in an agency shop."  (*Id.* at 1.)  If such a class is not suitable, the Hoekman plaintiffs propose certification of two subclasses out of those class members:

> (1) an "Agency-Fee" subclass, represented by Hoekman and Hanson, of "all nonunion members who have been forced to pay fair-share fees to Education Minnesota or its affiliates as a condition of their employment"; and

> (2) a "Reluctant-Uninformed-Union-Member" subclass,[6] represented by Buros, of "all members or former members of Education Minnesota or its

---

[5]      As in the *Hoekman* case, Piekarski also asserted several state law claims that do not form the basis for his class certification motion.  (*See* Piekarski 2d Am. Compl. ¶¶ 68–78.)

[6]      The Hoekman Plaintiffs labeled this potential subclass the "reluctant-union-member" subclass.  (*See* Hoekman CC Mem. at 1 n.1.)  However, in order to distinguish it from the Piekarski subclass that consists of union members who were reluctant but joined

> affiliates who would have quit the union had they not been forced to work in
> an unconstitutional agency shop and had they been fully informed of their
> constitutional rights."

(Hoekman Mem. in Supp. of Class Certification (Hoekman CC Mem.) [Doc. No. 94] at 1

n.1, 8)  The second class, labeled the "Union Resignation Class," is represented by Buros

and consists of "all current and former members of Education Minnesota and its affiliates

who had union membership dues taken from their paychecks after communicating their

desire to quit the union."  (Hoekman CC Mot. at 1.)

Piekarski also moved to certify two classes, both represented by him.  (Piekarski

CC Mot. at 1.)  The first, also labeled the "Agency Shop Class," is identical—though in

reference to AFSCME Council 5—to the Hoekman Plaintiffs' "Agency Shop" class.  It

consists of "[e]very public employee who was offered membership in AFSCME Council

5 or its affiliates while working in an agency shop."  (*Id.*)  Much like the Hoekman

Plaintiffs, Piekarski also proposes several subclasses, all represented by him, in the event

the Agency Shop class is unsuitable:

> (1) "non-members of AFSCME Council 5 who were compelled to pay 'fair-
> share fees' to the union" which, much like the Hoekman case, the Court shall
> refer to as the "Agency-Fee" subclass;
>
> (2) "employees who opposed payments to the union but who reluctantly
> joined because they decided that the difference between the cost of full
> membership dues and the mandatory 'fair-share fees' would not have been
> worth the loss of their voice and vote in collective-bargaining matters" which
> the Court shall refer to as the "Reluctant-Union-Member" subclass;

---

after purportedly conducting a cost-benefit analysis about the loss of their voice and vote
in collective bargaining matters, the Court will refer to this subclass as the "reluctant-
uninformed-union-member" subclass in order to reflect that this subclass encompasses
reluctant union members whose decision to join the union stemmed from lack of
information, not a cost-benefit analysis.

(3) "employees who opposed payments to the union but who joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in 'fair-share fees' " which the Court shall refer to as the "Reluctant-Uninformed-Union-Member" subclass; or, potentially,

(4) a subclass of only class members in proposed subclasses (2) and (3).

(Piekarski Mem. in Support of Class Certification (Piekarski CC Mem.) [Doc. No. 61] at 1 n.1.)  Piekarski's second class, labeled the "Membership Resignation Class," consists of all employees in bargaining units represented by AFSCME Council 5 or its affiliates who, at any time after *Janus*: (1) informed the union that they wished to terminate their union membership; and (2) whose instructions were not promptly honored and implemented, and who had union membership dues diverted from their paycheck after informing the union of their desire to withdraw from membership.  (Piekarski CC Mot. at 1.)

To summarize, the pending requests for class certification for the Hoekman Plaintiffs are: (1) an Agency Shop class, and (2) a Union Resignation class.  If the "Agency Shop" class is unsuitable, the Hoekman Plaintiffs propose two potential subclasses consisting of its members—an "Agency-Fee" subclass, and a "Reluctant-Uninformed-Union-Member" subclass.

The pending requests for class certification for Piekarski are: (1) an Agency Shop class, and (2) a Membership Resignation class.  If the "Agency Shop" class is unsuitable, Piekarski proposes up to four potential subclasses consisting of its members—an "Agency Fee" subclass, a "Reluctant-Union-Member" subclass, a "Reluctant-Uninformed-Union-Member" subclass, and/or a combination of the "Reluctant" union member subclasses.

## 2.    Motions to Exclude Expert Testimony

In support of their Motions for Class Certification, the Hoekman Plaintiffs and Piekarski submitted substantively identical—although case specific—reports from Dr. David A. Macpherson, the E.M. Stevens Professor of Economics at Trinity University in San Antonio, Texas.  (*See* Expert Report of Dr. David A. Macpherson for *Hoekman* (Macpherson Hoekman Rpt.) [Doc. No. 95-1]; Expert Report of Dr. David A. Macpherson for *Piekarski* (Macpherson Piekarski Rpt.) [Doc. No. 62-1].)  Each report is titled "Analysis of Class Action Qualification" and seeks to "analyze whether [each] case meets the requirements for class action qualification."  (Macpherson Hoekman Rpt. at 1–2; Macpherson Piekarski Rpt. at 1–2.)  Dr. Macpherson was also deposed in connection with his reports.[7]  (*See generally* Macpherson Dep. Tr.)

On November 18, 2019, all Defendants moved—in their respective cases—to exclude Dr. Macpherson's expert report.  (*See* Education Minnesota Defendants' Motion to Exclude Expert Testimony of Dr. David A. Macpherson (Educ. MN *Daubert* Mot.) [Doc. No. 101]; AFSCME Council 5 Motion to Exclude Expert Testimony of Dr. David A. Macpherson (AFSCME *Daubert* Mot.) [Doc. No. 72].)  Generally, Defendants argue that Dr. Macpherson's reports are inadmissible because they constitute legal opinions, lack any methodology, and consist of conjecture and speculation.  (*See* Education Minnesota Defendants' Mem. in Supp. of Mot. to Exclude Expert Testimony (Educ. MN *Daubert*

---

[7]     As noted above, Dr. Macpherson's deposition was jointly conducted by defendants in three cases, including these two matters.  *See supra* n. 1.

Mem.) [Doc. No. 103] at 1–2; AFSCME Mem. in Supp. of Mot. to Exclude Expert Testimony (AFSCME *Daubert* Mem.) [Doc. No. 74] at 1.)  Plaintiffs oppose each motion. (*See* Hoekman Mem. in Opp'n to Mot. to Exclude Expert Testimony (Hoekman *Daubert* Opp'n Mem.) [Doc. No. 115]; Piekarski Mem. in Opp'n to Mot. to Exclude Expert Testimony (Piekarski *Daubert* Opp'n Mem.) [Doc. No. 80].)

All Motions noted above have been fully briefed, and because of their similarity, were jointly argued before the Court.[8]  (*See* Hoekman Minute Entry [Doc. No. 119]; Piekarski Minute Entry [Doc. No. 83].)

## II.   DISCUSSION

### A.   Motions to Exclude Expert Testimony

The Court first addresses Defendants' Motions to Exclude the Expert Testimony of Dr. David A. Macpherson.  For the reasons discussed below, the Court grants in part and denies in part Defendants' Motions to Exclude Dr. Macpherson's testimony.

### 1.   Dr. Macpherson's Opinions

Plaintiffs in both cases each offer an expert report by an economist, Dr. David A. Macpherson, Ph.D., in support of their class certification motions.  (*See* Macpherson Hoekman Rpt.; Macpherson Piekarski Rpt.)  For each case, Dr. Macpherson was asked to analyze "whether [the] case meets the requirements for class action qualification" under the Federal Rules of Civil Procedure and relevant case law.  (Macpherson Hoekman Rpt.

---

[8]      Defendants each submitted post-argument notices of the *Littler* decision, *see supra* n.1, as supplemental authority in support of their motions to exclude Dr. Macpherson's testimony.  (*See* Education Minnesota Notice of Supp'l Auth. [Doc. No. 136]; AFSCME Notice of Supp'l Auth. [Doc. No. 89].)

at 2; Macpherson Piekarski Rpt. at 2.)[9]  In each case, Dr. Macpherson offers several opinions.  With some exceptions, the opinions are generally the same as those discussed in *Littler*, 2020 WL 1861646, at *2–7, and are in large part identical in each case here.

Dr. Macpherson's first opinion, offered only in the *Piekarski* report, is that Piekarski's proposed classes—as set forth in his Second Amended Complaint—are "clearly defined, and the definition is a sensical means of identifying people with common claims." (Macpherson Piekarski Rpt. at 7.)  He offers no methodology for how he arrived at this conclusion.

His second opinion, offered in both of his reports for these cases, is that the members of the "Reluctant-Union-Member" and "Reluctant-Uninformed-Union-Member" subclasses can be identified through a survey, and can generally be asked "whether or not they: (a) opposed payments to the union but reluctantly joined because they decided that the difference between the cost of full membership dues and the mandatory 'fair-share fees' would not have been worth the loss of their voice and vote in collective-bargaining matters; and (b) opposed payments to the union but joined because they were never informed of their constitutional right to decline union membership and pay a reduced amount in fair-share fees." (Macpherson Hoekman Rpt. at 7 n.3; Macpherson Piekarski Rpt. at 8.)  Dr.

---

[9]     The Court notes that the reports in these two cases predate, and formed the basis for, the expert report Dr. Macpherson submitted in the related *Littler* case in the Southern District of Ohio.  *See Littler*, 2020 WL 1861646, at *2–7 (discussing Macpherson expert report and rejecting nine out of ten of Macpherson's opinions); (*see also* Macpherson Dep. Tr. at 176–77 (acknowledging that the *Piekarski* report was drafted using the *Hoekman* report, which was subsequently used to draft the expert report submitted in the *Littler* case in Ohio).)

Macpherson asserts that "[t]his means of surveying employees is readily accepted in the field of economics," and if necessary, "the survey could take into account that workers' opinions about the union could change over time by restricting the follow-up to their state of mind at the time that they joined the union." (Macpherson Hoekman Rpt. at 7 n.3; Macpherson Piekarski Rpt. at 8.) Still, Dr. Macpherson does not describe what such a survey would look like beyond quoting the proposed class definitions. (Macpherson Dep. Tr. at 112–13 (admitting he has never surveyed union members or former "fair share" fee payers, and that he has "not designed any survey" or "explained the validated design for such a survey"), 113–14 (explaining that his comments about the survey in his reports were not a survey design, but asserting it could be done), 114–15 (admitting he has not designed any survey questions, procedures for validating the survey results, or "any methodology at all for conducting such a survey").)

Dr. Macpherson's third opinion—also offered in both cases—is that there are "a healthy number of class members." (Macpherson Hoekman Rpt. at 8; Macpherson Piekarski Rpt. at 9.) For the *Hoekman* matter, Dr. Macpherson supports that opinion by noting that as of June 4, 2019, Education Minnesota represented approximately 82,000 public employees, and that over 5,500 of them were agency fee payers. (Macpherson Hoekman Rpt. at 8.) He further notes that from 2018 to 2019, 647 members changed to paying "fair share" fees—as compared with approximately 43 to 67 member-to-fair-share switches in prior years. (*Id.*) For the *Piekarski* matter, Dr. Macpherson supports his opinion by noting that in 2018, AFSCME Council 5 represented just under 38,000 public employees, and that prior to *Janus*, just over 7,500 of those employees were agency fee

payers.  (Macpherson Piekarski Rpt. at 9.)   He further notes that in 2018, withdrawal requests—i.e., requests to cease membership and switch to "fair share" status—increased from prior years.  (*Id.*)

His fourth opinion, again offered in both cases, is that "a significant portion of union members" are part of the "reluctant" subclasses.  (Macpherson Hoekman Rpt. at 8; Macpherson Piekarski Rpt. at 9.)  To support these opinions, Dr. Macpherson relies on five sets of data: (1) Michigan's decline in union membership and contract coverage in the public sector after it banned agency fees in 2013; (2) two public sector unions'—AFSCME and the Service Employees International Union (SEIU)—loss of over 90% of their agency fee payers in 2018; (3) the fact that unionization rates among teachers are 24% lower in states that prohibited agency fees before *Janus* than in states that permitted them; (4) a high percentage of NEA members reported that they would stop paying dues if the union would still represent them; and (5) documents produced by both unions in discovery show that a number of members have expressed a desire to resign their memberships.  (Macpherson Hoekman Rpt. at 9–12; Macpherson Piekarski Rpt. at 8–11.)

Dr. Macpherson's fifth opinion, also offered in both cases, is that because damages awards for each individual plaintiff "may not be particularly large," it would be "uneconomical" for a plaintiff to pursue individual relief.  (Macpherson Hoekman Rpt. at 12; Macpherson Piekarski Rpt. at 11.)  He offers no methodology for how he arrived at this opinion.

His sixth opinion, offered in both cases, is that prior to *Janus*, "[m]any" members of the Education Minnesota and AFSCME bargaining units, when deciding whether to join

their respective unions, were "constrained in their choice by two different but not dissimilar options," namely, the belief that they had to join the union to even be employed in their position, and the reality that they had to either join the union or pay agency, or "fair share, fees. (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.) "Under the principles of economics," Dr. Macpherson opines, "neither of these 'choices' was a free choice." (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.) He also opines that "every public employee in an agency shop has this fact in common," and that this lack of free choice was the "predominant fact in the decision to become a union member or not." (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.)

Dr. Macpherson's seventh opinion, again offered in both cases, purports to identify five commonalities among putative class members: (1) the union's conduct, because the union treats the individuals it represents the same way; (2) whether union members could have resigned at any time and cease dues payments; (3) whether *Janus* has universal, retroactive application; (4) whether putative class members are entitled to a refund of their prior payments; and (5) the question of "how far back [the putative class members] can seek the return of" payments they made to the union. (Macpherson Hoekman Rpt. at 13–15; Macpherson Piekarski Rpt. at 12–14.) He concludes that "litigating these issues over and over in separate actions would be an enormous waste of the Court's time and resources as well as those of the parties." (Macpherson Hoekman Rpt. at 15; Macpherson Piekarski Rpt. at 14.) He acknowledges, however, that this opinion is not based on any economic or statistical analysis, or any damages calculations, and instead is what he believes to be "obvious" based on "basic math." (Macpherson Dep. Tr. at 112.)

His eighth opinion, offered in both cases, is that the choices faced by the named plaintiffs in each case "are typical of the choices of [sic] facing every public employee represented by" Education Minnesota and AFSCME Council 5.  (Macpherson Hoekman Rpt. at 15; Macpherson Piekarski Rpt. at 14.)  He offers no methodology for how he arrived at this conclusion.

Dr. Macpherson's ninth opinion, offered in both cases, is that the named plaintiffs in each case fit the definition "of being a class member" and that several would make good class representatives.  (Macpherson Hoekman Rpt. at 16–17; Macpherson Piekarski Rpt. at 15–16.)  For the *Hoekman* matter, Dr. Macpherson opines that Hanson "meets the definition of being a class member" and would be a good class representative because "he honestly answered the questions posed to him" in his deposition, "does not want any financial compensation other than a refund of his agency fees," has "no desire to bankrupt the union," and believes that "unions should receive some compensation for collective bargaining."  (Macpherson Hoekman Rpt. at 16.)  With respect to Hoekman, Dr. Macpherson concludes that she also meets the "definition of the class" and would be a good class representative because she "held up well during her almost seven-hour deposition," has expressed "a desire to provide class members with a choice," and does not want any financial compensation "other than a refund of her agency fees."  (*Id.* at 17.) Finally, with respect to Buros, Dr. Macpherson opines that she also meets "the definition of being a class member" although he offers no opinion as to whether Buros would make a good class representative.  (*Id.*)

For the *Piekarski* matter, Dr. Macpherson opines that Piekarski is "motivated to provide every class member a free and fair choice regarding union membership," appears "knowledgeable about the options available to public employees represented by AFSCME Council 5," appears to "understand[] the fee arrangement for counsel . . . as well as the lawsuit itself," and appears "to be a man of conviction about making sure that every union member is treated fairly and represented equally."  (Macpherson Piekarski Rpt. at 15.) Related to this opinion, Dr. Macpherson also opines that with respect to former-named plaintiff, Randall Eason, "a class-action case such as this is highly susceptible to a pickoff move for a class representative" and the "temptation of an individual settlement offer affects every potential class representative, including most probably Mr. Eason, who settled on terms unknown to [Dr. Macpherson]." (*Id.*)  Notably, however, Dr. Macpherson admitted that he has no idea whether there was such a "pick off" move in the *Piekarski* matter, that Eason settled under terms unknown to him, and that he has no idea whether Eason himself pursued the settlement.  (Macpherson Dep. Tr. at 161–62.)

Finally, Dr. Macpherson's tenth opinion is that the incentives of the proposed class counsel—counsel for all plaintiffs—are aligned with the putative class members. (Macpherson Hoekman Rpt. at 17–19; Macpherson Piekarski Rpt. at 16.)  This opinion is based on Dr. Macpherson's discussions with proposed class counsel, and his review of their fee arrangements and litigation credit agreements.  (Macpherson Hoekman Rpt. at 17–19; Macpherson Piekarski Rpt. at 16.)

## 2.    Legal Standard

Pursuant to Federal Rule of Evidence 702, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," the testimony "is based on sufficient facts or data," is "the product of reliable principles and methods" and the expert "has reliably applied the principles and methods to the facts of the case."   When considering expert testimony, a court " 'must ensure that all scientific testimony is both reliable and relevant.' "   *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019) (quoting *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (internal citations omitted) (internal quotation marks omitted)).   Put another way, the trial court must exercise a gatekeeping role in order to ensure that expert testimony meets the requirements of Rule 702.   *See id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).   The proponent of the expert testimony must show, by a preponderance of the evidence, that the expert is qualified to render the opinion offered, and that his or her methodology is scientifically valid.   *Id.* (citation omitted).

While it is true that "under *Daubert*, liberal admission" of expert testimony "is prevalent," *Id.* at 1001 (citing *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 562 (8th Cir. 2014), and " '[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility[,]' " *Id.* (quoting *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006)), it is also true that courts must not overlook their gatekeeping role.   *Id.* (citing *Daubert*, 509 U.S. at 589).   Even under *Daubert*'s "liberal

admission" standard, "[e]xpert testimony is inadmissible if it is speculative, unsupported by sufficient facts, or contrary to the facts of the case." *Id.* (citing *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000)).  Moreover, courts consider the methodology used by the expert in reaching his or her opinions, analyzing whether "the reasoning or methodology underlying the [proposed expert] testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue[.]" *Id.* at 1000–1001 (citation omitted) (internal quotation marks omitted).  " '[A]ny step that renders the analysis unreliable renders the expert's testimony inadmissible . . . [regardless of] whether the step completely changes a reliable methodology or merely misapplies that methodology.' " *Id.* at 1001 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222–23 (10th Cir. 2003) (internal citation omitted) (internal quotation marks omitted)).  Indeed, "[a] court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.' " *Id.* at 1000 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  " 'When the analytical gap between the data and proffered opinion is too great, the opinion must be excluded.' " *Id.* (quoting *Marmo*, 457 F.3d at 758).

Additionally, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge . . . ." *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake*, 64 F.3d 435, 438–39 (8th Cir. 1995)); *see also Farmland Indus. v. Frazier-Parrott Commodities, Inc.*, 871 F.2d 1402, 1409 (8th Cir. 1989) (noting that " [t]he special legal knowledge of the judge [rendered] the witness'[s] testimony' " on legal questions

24

" 'superfluous' " (quoting *Marx & Co. v. Diner's Club, Inc.*, 550 F.2d 505, 510 (2d Cir.

1977), *cert. denied*, 434 U.S. 861 (1977))).   Moreover, aside from being superfluous, the

admission of expert testimony about the requirements of the law improperly " 'give[s] the

appearance that the court [is] shifting to witnesses the responsibility to decide the case.' "

*Portz v. St. Cloud Univ.*, 297 F. Supp. 3d 929, 952 (D. Minn. 2018) (quoting *Farmland

Indus.*, 871 F.2d at 1409).   Still, expert testimony that *supports* a legal conclusion—as

opposed to testimony that a legal standard has in fact been met—is not inadmissible.   As

one court put it:

> In distinguishing admissible testimony from inadmissible [legal] testimony,
> the task for the Court is to ask whether the expert's opinions bear on some
> factual inquiry or whether they bear solely on the legal conclusions that are
> urged.   In other words, an expert may offer his opinion as to facts that, if
> found, would support a conclusion that the legal standard at issue was
> satisfied, but he may not testify as to whether the legal standard has been
> satisfied.

*Walsh v. Principal Life Ins. Co.*, 266 F.R.D. 232, 238 (S.D. Iowa 2010) (citing *Woodard

v. Andrus*, No. 03-2098, 2009 WL 140527, at *2 (W.D. La. Jan. 20, 2009)) (internal

quotation marks omitted).   Whether a legal standard has been met is for the Court—and

the Court alone—to decide, not an expert.   *Peterson v. City of Plymouth*, 60 F.3d 469, 475

(8th Cir. 1995) (excluding expert testimony on whether officer conduct was reasonable

under Fourth Amendment standards).

Finally, at the class certification stage, the district court "need not conduct 'a full

and conclusive *Daubert* inquiry.' "   *In re Hardieplank Fiber Cement Siding Litig.*, No. 12-

md-2359, 2018 WL 262826, at *8 (D. Minn. Jan. 2, 2018) (quoting *In re Zurn Pex

Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 612, 614 (8th Cir. 2011)).   Rather, the court

"need only conduct 'a focused *Daubert* analysis which scrutinize[s] the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence.' " *Id.* (quoting *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d at 614).

### 3.    Party Arguments

In support of each of their Motions to Exclude Dr. Macpherson's testimony, Defendants advance substantively similar arguments. Both the Education MN Defendants and AFSCME Council 5 assert that Dr. Macpherson's reports constitute improper legal opinion, specifically about whether class certification is appropriate. (Educ. MN *Daubert* Mem. at 5–6; AFSCME *Daubert* Mem. at 2–4.) They also argue that Dr. Macpherson's opinions do not satisfy the standards of Fed. R. Evid. 702 because he draws no reliable conclusions based on any proper economic analysis, uses simple logic and arithmetic as opposed to any expert economic methodology, and improperly opines on the credibility of the named plaintiffs and class counsel. (Educ. MN *Daubert* Mem. at 7–14; AFSCME *Daubert* Mem. at 4–9.)

Plaintiffs' response in both cases is somewhat terse. They argue that Dr. Macpherson is a qualified professor of economics, who is published in the field of labor unions, and that his opinions stem from that research. (Hoekman *Daubert* Opp'n Mem. at 1; Piekarski *Daubert* Opp'n Mem. at 1–2.) They further assert that Dr. Macpherson is not opining on the question of class certification, but rather weighing in on the factual underpinnings necessary to that decision, which is permissible. (Hoekman *Daubert* Opp'n Mem. at 1; Piekarski *Daubert* Opp'n Mem. at 1–2.) They also contend that his testimony related to numerosity is a factual inquiry, that his proposed survey is an economic

26

methodology supported by Dr. Macpherson's experience as an economist and scholar, and that his use of data and statistics from Michigan and the NEA survey supports an inference for his opinion that class members would likely be more than 40, not that there are actually more than 40 class members.  (Hoekman *Daubert* Opp'n Mem. at 2–5; Piekarski *Daubert* Opp'n Mem. at 2–5.)  Finally, Plaintiffs contend that even if some aspects of the report are objectionable, such issues do not warrant rejection and exclusion of the entire report. (Hoekman *Daubert* Opp'n Mem. at 2; Piekarski *Daubert* Opp'n Mem. at 2.)

### 4.     Analysis

The Court analyzes each of Dr. Macpherson's opinions to determine whether any meet the requirements of Rule 702, keeping in mind that Plaintiffs bear the burden of showing, by a preponderance of the evidence, that Dr. Macpherson is qualified to render the opinion offered, and that the methodology underlying his opinions is scientifically valid.  *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d at 1000.  There is no dispute that Dr. Macpherson is a qualified economist, nor is there any assertion that his education or credentials are somehow insufficient to support his opinions.  Rather, the dispute here rests on whether his opinions are of the proper *type*—i.e. that they are not legal opinions and are helpful to the trier of fact—and are supported by a scientifically reliable methodology.  The Court agrees with the *Littler* court and similarly finds that the first nine of Dr. Macpherson's opinions are improper conclusions of law, unhelpful in understanding the evidence or determining a fact at issue, or conclusory or speculative.  *See Littler*, 2020 WL 1861646, at *4.  However, the Court finds that Dr. Macpherson's tenth opinion— related to the alignment of class counsel's interests with class members—is admissible.

27

### a.    Improper Legal Opinions

As noted above, "expert testimony on legal matters is not admissible" because "[m]atters of law are for the trial judge . . . ." *S. Pine Helicopters, Inc.*, 320 F.3d at 841 (citing *Klaphake*, 64 F.3d at 438–39).  As the Sixth Circuit has observed, testimony that is "carefully couched in the precise language used in case law" is "particularly suspect" because it indicates that the expert had either a "keen awareness . . . of the direction in which he had to head, or else careful coaching prior to his testimony." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111 (1995).

Dr. Macpherson improperly renders legal opinions when he concludes that the proposed classes in the *Piekarski* matter are "clearly defined" and "sensical" (Opinion One), that there are "common" legal questions among the putative class members in both cases (Opinion Seven), that the choices of the putative class members about whether or not to join the union were "typical" (Opinion Eight), and that several of the named plaintiffs fit the definition of being a class member and would make good class representatives (Opinion Nine).[10]  As the *Littler* court noted, "[w]hile these words have lay usages, they have legal meaning in the class certification context, and Dr. Macpherson's report makes clear that he inappropriately uses these words in their legal sense to draw legal conclusions."  2020 WL 1861646, at *5; *see Lombardo v. Saint Louis City*, No. 4:16-cv-

---

[10]    As to Opinion Nine, Dr. Macpherson's observations regarding several named plaintiffs' positive characteristics, such as honesty and conviction, are also improper as they relate to the credibility of these individuals. *See Engesser v. Dooley*, 457 F.3d 731, 736 (8th Cir. 2006) ("An expert may not opine on another witness's credibility."), *cert. denied*, 549 U.S. 1223 (2007).

01637-NCC, 2019 WL 414773, at *8 (E.D. Mo. Feb. 1, 2019) (excluding expert opinions regarding key legal terms such as "excessive" and "unnecessary" in an excessive use of force case). In fact, for both cases, Dr. Macpherson acknowledges that opining on whether each case "*meets the requirements for class action qualification*"—a distinctly legal finding reserved to the Court—is exactly what he was hired to do. (*See* Macpherson Hoekman Rpt. at 2; Macpherson Piekarski Rpt. at 2; Macpherson Dep. Tr. at 47, 134.) Moreover, Dr. Macpherson structured his report loosely around the requirements for class certification, and frequently quoted from and relied on language taken directly from judicial opinions written by this Court. (Macpherson Hoekman Rpt. at 6, 8, 12, 14–15; Macpherson Piekarski Rpt. at 6, 9, 12–14.) Finally, Dr. Macpherson concluded each report by noting that he gave "*[his] opinion as to each [of the factors related to class certification] based on [his] experience, training, research, and review of the materials*." (Macpherson Hoekman Rpt. at 19 (emphasis added); Macpherson Piekarski Rpt. at 16 (emphasis added).)

Plaintiffs' arguments that Dr. Macpherson is simply "weighing in" on the factual questions underpinning class certification is, at least with respect to these legal opinions, unavailing. Certainly, some of his fact-based opinions—such as his opinion that a survey is an effective tool to delineate who should be in what class, his citation to the number of union members, fair share fee payers, and other raw data, etc.—are not, at least on their face, legal opinions. *See Walsh*, 266 F.R.D. at 238 ("[A]n expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he *may not testify as to whether the legal standard has been satisfied*."

(emphasis added)).  For Opinions One, Seven, Eight, and Nine, however, Dr. Macpherson literally concludes, using legally significant terminology taken directly from certain prior decisions of this Court, that several aspects of the class certification analysis are satisfied. Such conclusions are impermissible legal opinions, exclusively reserved for the Court, *see* Fed. R. Civ. P. 23(c)(1)(A), and accordingly will be excluded.

### b.    Opinions That Do Not Assist Trier of Fact

"The touchstone for the admissibility of expert testimony is whether it will assist or be helpful to the trier of fact." *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010) (citation omitted) (internal quotation marks omitted), *cert. denied*, 562 U.S. 1109 (2010). Consequently, "[i]f the subject matter is within the jury's knowledge or experience . . . the expert testimony remains subject to exclusion because the testimony does not then meet the helpfulness criterion of Rule 702." *Id.* at 809 (citation omitted) (internal quotation marks omitted).  In fact, where the subject matter is within the jury's knowledge or experience, permitting an expert to testify about the subject matter improperly lends an expert's "aura of expertise" to the subject, which in turn prejudices the opponent of the testimony. *United States v. Arenal*, 768 F.2d 263, 269–70 (8th Cir. 1985).

Here, several of Dr. Macpherson's opinions are not helpful to the trier of fact because they do not require anything beyond the abilities of a layperson to understand. Opinions Three and Four—namely, that there are a "healthy number of class members" based on union data in each case, and that a "significant portion" of union members are likely part of the "reluctant" subclasses, respectively—are based only on rudimentary arithmetic and observations of data that require no special expertise or guidance.  (*See*

Macpherson Dep. Tr. 58 (acknowledging he has not conducted any research attempting to measure or analyze attitudes towards union membership in Minnesota), 63 (noting that data about numerosity came from the union and that Dr. Macpherson did not perform any economic analysis to reach those numbers), 65 (noting that any percentages related to changes in union membership was simply "math," not a statistical regression analysis), 66 (same method for percentage calculation), 68 (admitting that he has not performed any statistical analysis at all for his opinion that a significant portion of union members fall into the reluctant subclasses), 79 (acknowledging that opinion four is "simply inference").)

Opinion Five—that it would "uneconomical" for any individual plaintiff to pursue individual relief—is similarly unhelpful because it does not take any economic expertise to know that litigation is costly, and that individual plaintiffs may not pursue a claim where damages would be minimal; that is common sense.  Opinion Seven—identifying commonalities among AFSCME and Education Minnesota bargaining unit members—is simply "an unsophisticated observation [that] requires no special expertise" to reach. *Littler*, 2020 WL 1861646, at *5 (reaching the same findings about Opinions Three, Four, Five, and Seven).  Indeed, Dr. Macpherson acknowledges that Opinion Seven is not based on economic analysis or damages calculations; it is what he believes to be "obvious" based on "basic math."  (Macpherson Dep. Tr. at 112.)  Yet "Dr. Macpherson is not entitled to the testimonial latitude of an expert when," with respect to these particular aspects of his reports, "he merely offers opinions requiring none of the knowledge and experience that warranted that latitude in the first place."  *Littler*, 2020 WL 1861646, at *5.

31

### c.      Lack of Methodology

Federal Rule of Evidence 702 requires that expert opinions be both the product of reliable principles and methods, and that said principles and methods be reliably applied to the facts of the case.  *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d at 1000–1001 (citation omitted) (internal quotations marks omitted).  Notably, where an expert's opinions are the product of *no* principles or methods, and instead are based on unsubstantiated conclusions, speculation, and mere conjecture, they cannot meet the requirements of Fed. R. Evid. 702.  *See Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 635 (8th Cir. 2007) (affirming exclusion of expert testimony where purported expert "employed no methodology whatsoever—reliable or otherwise").

Here, several of Dr. Macpherson's opinions lack any methodology.  For example, Opinion One—that Piekarski's proposed class is "clearly defined" and a "sensical" means of identifying class members—is a conclusory statement unsupported by any methodology or reasoning.  In fact, the opinion is vaguely circular: it reaches the conclusion that a "class definition" has been met *because*" the class is "clearly defined" and "sensical" yet points to the purported "class definition" itself as the reason it is "clearly defined."  (Macpherson Piekarski Rpt. at 7.)

Opinion Two—that members of the "reluctant" and "reluctant-uninformed" union member subclasses can be identified through a survey—is equally unsupported by any methodology sufficient for the Court to assess its reliability.  Dr. Macpherson admits that he has never performed any such survey of union members, fair share fee payers, or former fair share fee payers, and has "not designed any survey of union members [or] explained

"[a] validated design for such a survey" in these cases.  (Macpherson Dep. Tr. at 112–13.)

Moreover, he has not drafted any questions for such a survey—much less questions

designed to avoid potentially biased outcomes or a "low response rate"—nor has he drafted

a procedure for "validating the results of those questions."  (*Id.* at 114.)  Put simply, Dr.

Macpherson admits that he has not proposed "*any methodology* at all for conducting such

a survey of class members" in these cases, but still contends that it "can be done" using

"standard techniques[.]"  (*Id.* at 113, 115 (emphasis added).)

The Court finds Dr. Macpherson's assertion that the survey can still be done to be

unavailing, particularly in light of the nature of such a survey and Dr. Macpherson's

admissions about the difficulty of properly studying attitudes towards union membership.

Dr. Macpherson himself acknowledges that he has not attempted to study attitudes towards

union membership—much less in Minnesota specifically (*see id.* at 58)—because "[y]ou

can't measure attitudes very well."  (*Id.* at 50.)  An attitude about union membership, he

acknowledged, is "someone's opinion" that can rest on "multiple factors" that vary widely

by individual.  (*Id.*)  When asked whether it would be difficult to study the causal effects

of attitudes on union membership, Dr. Macpherson testified that it is the nature of the

"actual variables themselves" that are the problem, and that when conducting regression

analyses in surveys, "you don't have a separate attitude variable for every person" because

"[t]hat'd be nuts."  (*Id.* at 51.)  Such an analysis would be, in Dr. Macpherson's own words,

"impossible" to do "[a]t the level of an individual."  (*Id.* at 52.)  Yet, despite that admission,

that is precisely what Dr. Macpherson proposes doing here: a survey that inquires into

individuals' feelings about their decision to join or not join their respective unions.  As the

*Littler* court put it, this Court "cannot credit Dr. Macpherson's ready acceptance of the idea of a survey with no identified parameters, particularly when the hypothetical survey to which he refers appears to violate his professional standards" and lacks the "intellectual rigor that characterizes the practice of an economist." 2020 WL 1861646, at *6.

Opinion Four—that a "significant portion of union members" are part of the "reluctant" subclasses—similarly suffers from an " 'analytical gap between the data and proffered opinion' " and accordingly " 'must be excluded.' " *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d at 1000 (quoting *Marmo*, 457 F.3d at 758). Dr. Macpherson admits that "regression analysis" is the "standard methodology used by economists" such as himself "to draw conclusions about the relationships between variables" and that controlling for relevant variables is an important aspect of that analysis. (Macpherson Dep. Tr. at 15–17.) Despite that fact, he admitted he used *no methodology* whatsoever for coming to Opinion Four, had not performed *any* statistical analysis, had not controlled for any other variables, and that his conclusion was "simply inference" from various data sets for which he could state no potential error rate. (*Id.* at 68, 79–80.) Aside from failing to meet even his own field's "standard methodology," such "inference" is also unhelpful to the trier of fact because it constitutes a conclusion or inference that a jury is capable of reaching on its own. *See Somnis v. Country Mut. Ins. Co.*, 840 F. Supp. 2d 1166, 1173 (D. Minn. 2012) (noting that "an expert who simply 'draws inferences or reaches conclusions within the jury's competence' does not provide 'helpful' testimony under Rule 702" (citation omitted)); *see also Littler*, 2020 WL 1861646, at *6 (excluding Opinion Four based on Dr. Macpherson's "unfounded extrapolations from [] limited data sets").

34

Opinion Six—that unidentified "principles of economics" show that many bargaining unit members for each union lacked a "free choice" pre-*Janus* as to whether to join the union—is speculative and contradicted by Dr. Macpherson's own testimony.  In his report, Dr. Macpherson asserts that this lack of choice was reflected in two possible beliefs held by public employees.  First, the employees may have held the erroneous belief that "they had to join the union or cease to be a public employee."  (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.)  Yet Dr. Macpherson admits that he has no basis for the conclusion that many bargaining member unit members were constrained by this belief.  He has not conducted any economic analysis to determine the number of union members at any point in time who may have felt that way, nor does he know with any level of certainty the number of Minnesota public employees who purportedly suffered from this failure of information.  (Macpherson Dep. Tr. at 116–117.)  Second, he asserts, the employees may have labored under the "factually correct but legally inaccurate (based on *Janus*) choice between joining the union or paying an agency fee."  (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.)  Yet again he acknowledges—after disclaiming any ability to offer legal opinions about the legal inaccuracy of the belief (Macpherson Dep. Tr. at 118)—that such a conclusion is mere inference and, in any event, agency fees were legal before 2018.  (*Id.* at 117–18.)

Even assuming Opinion Six was methodologically sound, Dr. Macpherson then speculates that this lack of free choice was "the predominant fact in the decision to become a union member or not."  (Macpherson Hoekman Rpt. at 13; Macpherson Piekarski Rpt. at 12.)  Yet such a logical leap is simply too great based on the information—or lack thereof—

available to Dr. Macpherson.  Aside from the fact that he has not analyzed how many bargaining unit members labored under these two beliefs—which he asserts is simply a fact (Macpherson Dep. Tr. at 118)—he also does not account for the fact that, by his own admission, public employees' attitudes towards union membership could potentially change over time.  (Macpherson Dep. Tr. at 105.)  And when pressed further, he admitted that the choice to join a union or not join a union—where either requires payment—is *still a choice*, albeit in a "take it or leave it" context akin to being hired at a non-negotiable wage.  (*Id.* at 150–51.)  While a "take it or leave it" choice may be problematic in economics, Dr. Macpherson's opinion offers nothing about the legal effect of that type of choice, much less one supported by a sufficient, reliable methodology.  *Littler*, 2020 WL 1861646, at *6.

Finally, Opinion Eight—that the named plaintiffs' claims are typical of the choices facing every public employee represented by their respective unions—is simply a "mere conclusory statement[] without any methodological basis[.]"  *Id.*  Accordingly, it will be excluded.  *See In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d at 1000 ("A court should not admit opinion evidence that 'is connected to existing data only by the *ipse dixit* of the expert.' " (quoting *Gen. Elec. Co.*, 522 U.S. at 146)).

### d.    Opinion Ten

As noted above, Opinions One through Nine are inadmissible.  That leaves only Opinion Ten: that the economic incentives of class counsel for both cases are aligned with the goals of the putative class members such that they are adequate class counsel.  (Macpherson Hoekman Rpt. at 17–19; Macpherson Piekarski Rpt. at 16.)  Dr. Macpherson

bases this conclusion on his review of various fee arrangements and litigation credit agreements involved in the case, and his discussions with proposed class counsel, along with his experience in economics. (Macpherson Hoekman Rpt. at 17–19; Macpherson Piekarski Rpt. at 16.) The Court sees nothing wrong with this opinion, and accordingly will not exclude it. *See Littler*, 2020 WL 1861646, at *7 (reaching the same conclusion).

In summary, Defendants' Motions to Exclude Expert Testimony are **GRANTED** with respect to Opinions One through Nine, and **DENIED** with respect to Opinion Ten.

### B.       Motions for Class Certification

The Court now turns to Plaintiffs' Motions for Class Certification.

### 1.       Legal Standard

Plaintiffs each seek certification of their respective classes under Federal Rule of Civil Procedure 23(b)(3). Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). Accordingly, the standard for obtaining class certification "is an onerous one." *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. 245, 255 (D. Minn. 2018). Rule 23 "does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate his [or her] compliance with the Rule—that is, he [or she] must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." 564 U.S. at 350 (emphasis in original). Class certification is only proper if the Court is satisfied, after a "rigorous analysis," that the prerequisites of Rule 23 have been satisfied. *Id.* at 350–51. Such an analysis frequently "entails some overlap with

the merits of the plaintiff's underlying claim," which simply "cannot be helped" given that questions of class certification " 'generally involve[] considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' " *Id.* at 351 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)).

To show entitlement to class certification, Plaintiffs bear the burden of establishing "all the requirements of Rule 23(a) and one of the subsections of Rule 23(b)." *Hale v. Emerson Elec. Co.*, 942 F.3d 401, 403 (8th Cir. 2019) (citing *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citation omitted)); *see also Stuart v. Global Tel*Link Corp.*, 956 F.3d 555, 560 (8th Cir. 2020) (noting that the movant seeking class certification must show its entitlement to class certification). Rule 23(a)(1)–(4) requires that Plaintiffs' proposed classes (1) are "so numerous that joinder of all members is impracticable;" (2) contain "questions of law or fact common to the class;" (3) have "claims and defenses of the representative parties [that] are typical of the claims or defenses of the class;" and (4) have "representative parties [that] will fairly and adequately protect the interests of the class." These four requirements are commonly referred to as "numerosity, commonality, typicality, and adequate representation[.]" *Stuart*, 956 F.3d at 560.

As to the "numerosity" requirement, set forth in Fed. R. Civ. P. 23(a)(1), the putative class must contain sufficient numbers that joinder of all the putative class members would be impracticable. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982). Generally, a putative class size of forty or more will support a finding of numerosity, although smaller classes have been found acceptable in this circuit. *See George v. Uponor*

*Corp.*, No. 12-cv-249 (ADM/JJK), 2015 WL 5255280, at *3 (D. Minn. Sept. 9, 2015) (collecting cases).

The "commonality" requirement, set forth in Fed. R. Civ. P. 23(a)(2), demands that plaintiffs "demonstrate that the class members 'have suffered the same injury[.]' " *Dukes*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 157). The requirement is "easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.' " *Id.* at 349 (citation omitted). It does not "mean merely that [plaintiffs and putative class members] have all suffered a violation of the same provision of law." *Id.* at 350. Rather, "[t]heir claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Put another way, it is not common questions that satisfy the "commonality" requirement, but rather " 'the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of litigation. Dissimilarities within the proposed class . . . have the potential to impede the generation of common answers.' " *Id.* (citation omitted) (emphasis in original).

The "typicality" requirement, set forth in Fed. R. Civ. P. 23(a)(3), requires a showing that " 'there are other members of the class who have the same or similar grievances as the [representative] plaintiff.' " *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 286 (D. Minn. 2018) (quoting *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir. 1990)). Accordingly, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the

same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.2d 1525, 1540 (8th Cir. 1996).

The "adequacy of representation" requirement, set forth in Fed. R. Civ. P. 23(a)(4), typically involves two questions: "(1) whether the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Medtronic, Inc.*, 325 F.R.D. at 286–87 (citing *Paxton*, 688 F.2d at 562–63).  Notably, adequate class representation is not present if a "conflict of interest" exists that prevents the representative party from "fairly and adequately protecting the interests of all of the class members." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999) (citation omitted). Intraclass conflicts precluding certification exist where " 'some party members claim to have been harmed by the same conduct that benefitted other members of the class' " because in such a situation, " 'the named representatives cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interest and objectives of other class members.' " *Duchardt v. Midland Nat'l Life Ins. Co.*, 265 F.R.D. 436, 449 (S.D. Iowa 2009) (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal citations omitted) (internal quotation marks omitted)).

Implicit in these Rule 23 requirements is the necessity that "a class be 'adequately defined and clearly ascertainable.' " *J.S.X. Through Next Friend D.S.X. v. Foxhoven*, 330 F.R.D. 197, 206 (S.D. Iowa 2019) (quoting *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016)).  Generally, this requires that class members can

"be identified by reference to objective criteria." *McKeage v. TMBC, LLC*, 847 F.3d 992, 998 (8th Cir. 2017). While Plaintiffs need not be able to identify all class members at the time of certification, the Court should " 'not be required to resort to speculation, or engage in lengthy, individualized inquiries' " to ascertain the class. *Foxhoven*, 330 F.R.D. at 206 (quoting *Brown v. Kerkhoff*, 279 F.R.D. 479, 496 (S.D. Iowa 2012)).

Because Plaintiffs seek certification under Rule 23(b)(3) (*see* Hoekman CC Mot.; Piekarski CC Mot.), they must also establish, beyond Rule 23(a)'s "threshold prerequisites for all class actions," *see Stuart*, 956 F.3d at 560, that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The "pertinent" aspects of this "predominance" requirement include, but are not necessarily limited to, "the class members' interests in individually controlling the prosecution or defense of separate actions;" the "extent and nature of any litigation concerning the controversy already begun by or against class members;" the "desirability or undesirability of concentrating the litigation of the claims in the particular forum" and the "likely difficulties in managing [the] class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

This "predominance" inquiry—governed by "even more demanding" rigorous analysis than Rule 23(a), *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)—" 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation[,]' " *Stuart*, 956 F.3d at 560 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)), and requires that " 'the common, aggregation-enabling, issues in

the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.' "  *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016)).  This requirement is " 'not satisfied if individual questions . . . overwhelm the questions common to the class.' "  *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. at 256 (quoting *Ebert v. General Mills, Inc.*, 823 F.3d 472, 478–79 (8th Cir. 2016)).  Put another way, "[w]here the resolution of a common issue 'breaks down into an unmanageable variety of individual legal and factual issues,' the predominance requirement is not satisfied."  *Id.* at 257 (quoting *Nobles v. State Farm Mut. Auto. Ins. Co.*, No. 10-04175-CV-C-NKL, 2013 WL 12153517, at *2 (W.D. Mo. June 5, 2013) (citation omitted)).  Still, a class may be certified based on common issues even if " 'other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.' "  *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 375 (8th Cir. 2018) (quoting *Tyson Foods, Inc.*, 136 U.S. at 1045).

### 2.    Analysis

The Court first addresses the "Agency Shop" class and the "Agency-Fee" subclass proposed in both cases.  (*See* Hoekman CC Mot.; Piekarski CC Mot.)  It then addresses the two variations of "Reluctant" union member subclasses.  Finally, it addresses the proposed "Union Resignation Class" (*Hoekman*) and "Membership Resignation Class" (*Piekarski*), which are substantively similar.

### a.    Agency Shop Class & Agency-Fee Subclass

The first proposed class—sought by plaintiffs in both cases (*see* Hoekman CC Mot.; Piekarski CC Mot.)—is the "Agency Shop" class, which consists of "every public

employee who was offered membership in [Education Minnesota or AFSCME Council 5] or its affiliates while working in an agency shop." (Hoekman CC Mot.; Piekarski CC Mot.) If that class is not certified, both plaintiffs propose that it be broken up into subclasses, one of which is the "Agency-Fee" subclass consisting of all "non-members of [Education Minnesota or AFSCME Council 5]" who were compelled or forced "to pay 'fair-share fees' to" their respective union. (*See* Hoekman CC Mem. at 1 n.1; Piekarski CC Mem. at 1 n.1.) Hoekman and Hanson are the proposed representatives of the Agency-Fee subclass in the *Hoekman* matter, while Piekarski is the proposed representative for the Agency-Fee subclass in the *Piekarski* matter.

Plaintiffs argue that each class meets the requirements of Rule 23(a) and Rule 23(b)(3). As an initial matter, numerosity appears to be satisfied for either proposed class.[11] Similarly, the adequacy of class counsel is not seriously at issue in either case for any proposed class, as Plaintiffs' counsel are seasoned attorneys with prior class-action litigation experience, and whose incentives to zealously litigate this case align with proposed class members.[12] (*See* Decl. of Talcott J. Franklin (*Piekarski*) [Doc. No. 62-4];

---

[11]   The *Hoekman* Agency Shop class could have up to 82,000 potential class members, while the *Piekarski* Agency Shop class could have up to 30,000 potential class members. (*See* Deposition of Robert Gardner (as 30(b)(6) deponent for Education Minnesota) [Doc. No. 95-2] at 15–16; Henderson Dep. Tr. at 22–24.) Similarly, the *Hoekman* "Agency-Fee" subclass could have up to 6,000 potential class members, while the *Piekarski* "Agency-Fee" subclass could have up to 4,000 potential class members. (*See* Gardner Dep. Tr. Ex. 2 at Doc. P. 28; Henderson Dep. Tr. Ex. 2 at Doc. P. 70.) Those numbers easily satisfy numerosity requirements within this circuit. *See George*, 2015 WL 5255280, at *3.

[12]   Education Minnesota asserts that class counsel are inadequate because they failed to disclose a third-party funder behind the lawsuit, failed to disclose the terms of that agreement to the named plaintiffs, and failed to explain to the *Hoekman* Plaintiffs that they

Decl. of Jonathan F. Mitchell (*Piekarski*) [Doc. No. 62-5]; Decl. of Douglas P. Seaton (*Piekarski*) [Doc. No. 62-6]; Macpherson Hoekman Rpt. at 17–19; Macpherson Hoekman Rpt. at 16.)

However, the Agency Shop class and the Agency-Fee subclass each suffer from a fatal intra-class conflict that touches on commonality, typicality, and the adequacy of class representation by the named plaintiffs. Moreover, the Agency Shop Class contains putative class members who lack standing, rendering certification of the overarching class impossible. The Court addresses each failing in turn.

### i.    Intra-class Conflict

First and foremost, both the Agency Shop class and the Agency-Fee subclass suffer from inherent intra-class conflicts stemming from a lack of commonality, typicality, and a failure of adequate representation over the proposed class. *Littler*, 2020 WL 1861646, at *8–9. The Agency Shop class—which, in each case, contains literally every person *ever* offered membership in either union—contains "pro-union and anti-union members who

---

could be liable to pay Education Minnesota's costs in the event Defendants are successful. (Education MN CC Opp'n Mem. at 24 n.14.) Moreover, while not explicitly arguing that class counsel are inadequate, AFSCME Council 5 notes that two of plaintiffs' attorneys are involved in at least twenty union-refund lawsuits of this sort, which could "certainly be characterized as a systematic effort to undermine organized labor throughout the country." (AFSCME CC Opp'n Mem. at 18 n.7.) Still, even construing these assertions strictly against class counsel, the Court finds that class counsel are adequate. Fed. R. Civ. P. 23(g) primarily demands consideration of counsel's experience, knowledge of the applicable law, resources, and the work he or she has done on the case when evaluating adequacy. Concerns about litigation funding agreements, possible disclosure failures, and involvement in other similar cases do not significantly undercut counsels' experience or knowledge of the applicable law, nor do they undermine the alignment of counsels' economic incentives with putative class members in this case. (*See* Macpherson Hoekman Rpt. at 17–19; Macpherson Piekarski Rpt. at 16.)

have fundamentally divergent interests in this litigation[,]" *Id.* at *8, namely, some that

support the union and some do not, and for various reasons. *See Schlaud v. Snyder*, 785

F.3d 1119, 1125 (6th Cir. 2015) (concluding that a "clear conflict" existed in proposed

class that alleged that class was forced to financially support union, but that contained

"substantial" number of members who favored financially supporting the union), *cert.*

*denied*, 136 S. Ct. 1512 (2016).  Similarly, while the Agency-Fee subclass is restricted to

only those bargaining unit members who declined to join the union, "that does not mean

that [the putative subclass members] all did so out of opposition to the union.  Rather it is

invariably the case that while some declined to join for ideological reasons, others wanted

to be represented by the union but sought to ride the coattails of their dues-paying

brethren."  *Littler*, 2020 WL 1861646, at *9.  Put another way, the cohesiveness of the

Agency Shop class and Agency-Fee subclass rests on Plaintiffs' erroneous assumption that

"someone who does not want to give money to the Union 'do[es] not . . . support' the

Union.  [However] even though money can be a form of 'support' and indeed, a form of

speech under the First Amendment, it is not clear that withdrawal of money *necessarily*

means withdrawal of support such that prior monetary contributions must be interpreted as

First Amendment injuries."  *Centeno v. Inslee*, 310 F.R.D. 483, 487–88 (W.D. Wash. 2015)

(emphasis added).

       Both unions in these cases have presented evidence demonstrating this intra-class

conflict.  In the *Hoekman* case, Education Minnesota provided numerous emails from

bargaining unit members withdrawing from union membership, but expressing support for

the union, and indicating that their withdrawal was necessary for a variety of reasons,

45

including other financial obligations, or due to their belief that fair share fees were sufficient financial support.  (*See* Gardner Decl. Ex. A [Doc. No. 108-1].)  It also provided affidavits from union members illustrating fervent continued interest in financially supporting the union (*see* Meza Decl. [Doc. No. 109-3] ¶ 5; DeMarre Decl. [Doc. No. 109-6] ¶¶ 6, 8; Engler Decl. [Doc. No. 109-10] ¶¶ 3, 7, 9), as well as affidavits from "fair share" fee payers (including some who later joined the union) explaining that their decision to pay "fair share" fees did not reflect non-support of the union.  (*See* Butler Decl. [Doc. No. 109-1] ¶¶ 1–4; Matson Decl. [Doc. No. 109-2] ¶¶ 3–5; Palmer Decl. [Doc. No. 109-7] ¶¶ 3–4.) AFSCME Council 5 has done the same for both union members (*see* Korenchen Decl. [Doc. No. 71-1] ¶¶ 2–3; Frazier Decl. [Doc. No. 71-5] ¶¶ 2–3; Lindsey Decl. [Doc. No. 71-9] ¶¶ 2, 5), as well "fair share" fee payers (including some who later joined the union). (*See* Lowren Decl. [Doc. No. 71-6] ¶¶ 2–5; Haugen Decl. [71-10] ¶¶ 2–5; Huerta-Stemper Decl. [71-12] ¶¶ 2–3, 7.)  Moreover, Plaintiffs in both cases *admit* that "[m]any of the class members would have voluntarily joined the union and paid membership dues [even] in a world without agency shops[.]"  (Hoekman CC Mem. at 5; Piekarski CC Mem. at 5.)

Further deepening this intra-class divide are the putative class representatives' own motivations, which vary significantly, and accordingly introduce further conflict into each individual employee's motivations for supporting, or declining to support, a union.  *See Weaver v. Univ. of Cincinnati*, 970 F.2d 1523, 1531 (6th Cir. 1992) (affirming denial of union fair-share fee class certification and noting "because the named plaintiffs' motivations are not clear, they may not be able to represent all [class members] effectively").  Hoekman, for example, is seeking remuneration of the dues she paid to the

union against her will, but she voluntarily chose to join her local union affiliate at approximately the same time she began employment as a teacher.  (Hoekman Dep. Tr. at 71–72, 89–90, 97.)  She subsequently changed to fair share status in 2006, yet cannot recall precisely why she did so other than her opinions changed.  (Hoekman Dep. Tr. 23, 44–45, 98, 110.)  Buros, on the other hand, joined her local union affiliate when she began her employment, remaining a member until after *Janus*.  (Buros Dep. Tr. 27; Hoekman Am. Compl. ¶ 30.)  She asserts that she joined the union because she erroneously believed she did not have a choice, although she now acknowledges that she did have a choice.  (Buros Dep. Tr. 31–32, 45–46, 57.)  And Hanson differs from both Hoekman and Buros; he has never joined a union through his employer—believing unions to be too politicized (Hanson Dep. Tr. at 69, 88)—and instead maintained "fair share" status until *Janus*.  (*Id.* at 14, 58–59).  Piekarski stated that his lawsuit is about recouping union dues going to back to when he resigned as president of his local union affiliate in 2015, as well as dues taken out of his paycheck after he resigned his union membership in 2017.  (Piekarski Dep. Tr. at 17–18, 22–23.)  He further stated that he wants to "fix this union problem" but when asked what relief looks like in this case for class members, he said "I have no idea."  (*Id.* at 21, 62–63.)  Importantly, all Plaintiffs acknowledge that the decision to join or not join a union is a personal choice dependent on the information available to the employee at the time the decision is made.  (Hoekman Dep. Tr. at 188–90; Buros Dep. Tr. at 120–22; Hanson Dep. Tr. at 75; Piekarski Dep. Tr. at 59.)

Plaintiffs respond that this intra-class conflict is avoidable because they are not seeking repayment for putative class members who do not want a refund.  (*See* Hoekman

CC Mem. at 5; Hoekman Reply Mem. in Supp. of Mot. for Class Certification (Hoekman

CC Reply) [Doc. No. 114] at 6–7; Piekarski CC Mem. at 5; Piekarski Reply Mem. in Supp.

of Mot. for Class Certification (Piekarski CC Reply) [Doc. No. 81] at 5–6.)  Rather, they

assert that the shared injury common to all class members is the denial of the choice to

support or not support the union, rather than the compelled payment of money, and that as

a result there is no conflict because all putative class members in both the Agency Shop

Class, and the Agency-Fee subclass, share that injury.[13]   (Hoekman CC Mem. at 5;

Piekarski CC Mem. at 5.)  This argument is unavailing, as it does not address the nature of

the intra-class conflict.  Certainly, a need for "[i]ndividual damage calculations [in a class

action] . . . [is] permissible if [the calculations] do not 'overwhelm questions common to

the class.' "  *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 798 n.5 (8th Cir. 2014)

(quoting *Comcast Corp.*, 569 U.S. at 34), *affirmed*, 136 S. Ct. 1036 (2016).  However, the

presence of commonality in the form of a "lack of choice" does not mean an intra-class

conflict does not exist.  Even if damages were limited only to those putative class members

who seek them, both the Agency Shop and Agency-Fee classes still contain pro-union

---

[13]     Plaintiffs rely heavily on *J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) (per curiam)
for this point.  However, *Azar* is easily distinguishable from this case.  *Azar* involved a
proposed class of all pregnant unaccompanied alien children in the government's custody
that sought to have the right to *choose* to have an abortion vindicated.  *Id.* at 1300, 1316.
Relevant here, the D.C. Circuit concluded that even though some members of the class
were opposed to abortion on religious or ideological grounds, such differences did not
create an intra-class conflict because even if the class members who sought abortions were
granted the right to receive them, it would have no effect on the pregnancies of other
members of the class.  *Id.* at 1318.  Here, granting relief to the members of the class who
seek refunds is *directly at odds* with the desires of those members who want the unions to
thrive, and the financial shortfall such a remedy would create will "necessarily [] have a
negative effect on the remaining members of the union."  *Littler*, 2020 WL 1861646, at *9.

supporters who would be harmed by the very damages given to other class members.  (*See* Altendorfer Decl. (*Piekarski*) [Doc. No. 71-16] at ¶ 4 (noting that after *Janus*, 840 individuals who were former "fair share" fee payers *joined* the union and became full dues-paying members).

In addition, as the *Littler* court noted, framing the class members' shared injury as a lack of choice is ultimately "a distinction without a difference[.]"  2020 WL 1861646, at *9.  It may *diminish* the conflict, but it does not eliminate it because any money paid out in a class action would necessarily come from Education Minnesota or AFSCME Council No. 5.  Consequently, even if the pro-union members of the class do not seek damages, their interests are still harmed by their fellow class members' pursuit of a refund because, if they are successful, it will diminish the union's finances.  That, in turn, may lead the unions to take action to counteract such a financial loss, such as increasing dues or decreasing services.  (*See* Gardner Decl. (*Hoekman*) [Doc. No. 108] ¶ 34 (noting that if refund is required, Education Minnesota and its affiliates would likely need to reduce representative services and raise membership dues).)  Put another way, awarding a refund to putative class members—even limiting such a refund to only those who seek it—will actively harm class members *in the same class* who do not seek a refund.  In such a situation, " 'the named representatives cannot vigorously prosecute the interests of the class through qualified counsel because their interests are actually or potentially antagonistic to, or in conflict with, the interest and objectives of other class members.' "   *Duchardt*, 265 F.R.D. at 449 (citation omitted).

ii.     **Class Member Standing in Agency Shop Class**

Even setting aside the intra-class conflicts, Plaintiffs' assertion that the lack of a choice is the common injury cannot overcome another defect, at least for the Agency Shop Class: some putative class members lack standing to sue.  As the Eighth Circuit has noted, "[a]lthough federal courts 'do not require that each member of a class submit evidence of personal standing,' a class cannot be certified if it contains members who lack standing." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263–64 (2d Cir. 2006)).  Accordingly, a class must be defined " 'in such a way that anyone within it would have standing.' " *Id.* (quoting *Denney*, 443 F.3d at 264.)  A core component of standing, among other things, is that there be a "causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . traceable to the challenged action of the defendant . . . .' " *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted).  Put another way, the injury at issue must be the defendant's fault.

In both cases, the Agency Shop class contains union members that had the opportunity to choose to join the union and pay full dues, or decline to join the union and pay agency fees instead.  Such a choice was entirely voluntary, rendering the supposed "denial of choice" injury for these voluntary members traceable only to their own decisions, and consequently not traceable to Defendants.  "[T]he fact that Plaintiffs did not like the two choices with which they were presented does not mean that they did not have the opportunity to choose freely between these two available alternatives." *Allen v. Ohio Civil Serv. Emps. Ass'n AFSCME, Local 11*, No. 2:19-cv-3709, 2020 WL 1322051, at *10

(S.D. Ohio Mar. 20, 2020).  Indeed, up until the Supreme Court's decision in *Janus* in 2018, such a choice was legally permissible, and entirely up to the employees.  *See Abood*, 431 U.S. at 236–36.  Moreover, it constituted "a binary choice from which they voluntarily chose one option over the other.  Such choices are omnipresent in daily life." *Allen*, 2020 WL 1322051, at *12.  That *Janus* later altered the nature of that choice does not alter the standing analysis as it relates to each voluntary member's past choice to join the union.  As one court put it, "[t]hat Plaintiffs may not have correctly assessed every relevant factor to their decisions (e.g., the likelihood that agency fees would be deemed unconstitutional) is irrelevant to evaluating the voluntariness of their decision." *Id.* at *10 (citation omitted); *see also Belgau v. Inslee*, 359 F. Supp. 3d 1000, 1017 (W.D. Wash. 2019) ("The notion that the Plaintiffs may have made a different choice if they knew 'the Supreme Court would later invalidate public employee agency fee arrangements [in *Janus*] does not void' their previous knowing agreements." (citation omitted)).

In sum, neither the Agency Shop class nor the Agency-Fee subclass can be certified due to the presence of intra-class conflicts.  Moreover, the Agency Shop class also contains putative class members who lack standing, further barring certification.  Accordingly, Plaintiffs' motions for class certification with respect to the Agency Shop classes, and Agency-Fee subclasses, are denied.[14]

---

[14]     Because the Court concludes that the intra-class conflicts are fatal to the Agency Shop class and Agency-Fee subclass, it need not and does not reach the other aspects of the class certification analysis for those two proposed classes.

  **b.** **"Reluctant" & "Reluctant-Uninformed" Union Member Subclasses**

  The Court now turns to the proposed "Reluctant-Union-Member" subclass (in *Piekarski*) and "Reluctant-Uninformed-Union-Member" subclass (in both *Hoekman* and *Piekarski*). The "Reluctant-Union-Member" subclass, represented by Piekarski, consists of "employees who opposed payments to the union but who reluctantly joined because they decided that the difference between the cost of full membership dues and the mandatory 'fair-share fees' would not have been worth the loss of their voice and vote in collective-bargaining matters[.]" (*See* Piekarski CC Mem. at 1 n.1.) On the other hand, the "Reluctant-Uninformed-Union-Member" subclass, represented by Buros in the *Hoekman* matter and Piekarski in his case, consists of union members who "joined" but "would have quit" the union had they been informed of their constitutional rights to decline union membership. (Hoekman CC Mem. at 1 n.1; Piekarski CC Mem. at 1 n.1).

  As an initial matter, the Court notes that for both "Reluctant" subclasses, Plaintiffs have not established numerosity. Plaintiffs rely on Dr. Macpherson's extrapolation from a national NEA survey—that is non-specific to Minnesota—that asked whether union members who "woke up tomorrow" and discovered they could still have union representation without paying anything would choose that option; the results indicated that up to 69 percent of respondents indicated they would no longer pay anything. (*See* Hoekman CC Reply at 18; Piekarski CC Reply at 23–24; *see also* Macpherson Hoekman Rpt. at 10–11; Macpherson Piekarski Rpt. at 9–11.) However, the Court has excluded Dr. Macpherson's opinion that this survey establishes numerosity in *Minnesota* as lacking any

methodology, much less a reliable one.   *See supra* § II(A)(4)(c).   But even if Dr. Macpherson's opinion on this point had not been excluded, the Court still could not rely on it to establish numerosity because the question posed in the NEA survey at issue offers no data on the number of union members who "reluctantly" joined the union because of a lack of information about constitutional rights, or as a result of a "cost-benefit" analysis between union dues and "fair share" fees.   Rather, the question Dr. Macpherson relies on asked whether union members would cease all payments to the union if they could do so and still retain union representation.   That question does not establish any "reluctance"— much less show reluctance at the time of a past decision—stemming from a lack of information or as a result of a cost-benefit analysis.   And even if did, the question was posed in a national survey that presumably includes data from other states and unions.   Yet Dr. Macpherson's own consideration of the survey does not account for any specific factors, whatever they may be, unique to Minnesota public employees in this state.[15]   (*See* Macpherson Dep. Tr. at 97–102 (acknowledging lack of any analysis of independent variables on NEA survey, and that asking even one follow-up question changed results of the NEA survey dramatically).)

---

[15]   Plaintiffs repeatedly rely on claims that the union refused to answer questions about the NEA survey, among other assertions of obstinance in discovery.   However, Plaintiffs in both cases never brought a motion to compel any discovery on these or other points.   *See* Fed. R. Civ. P. 37(a)(1) (permitting a party to move to compel disclosure or discovery). The Court will not infer satisfaction of an element of class certification—or that a fact exists but has not yet been uncovered—based on a lack of information Plaintiffs never sought to compel.

However, even assuming numerosity is satisfied, the "Reluctant" subclasses fail to satisfy the implied ascertainability requirement underlying Rule 23, as well as Rule 23(b)(3)'s predominance and superiority requirements. Put simply, not only will it be difficult to ascertain who fits within the "Reluctant" subclasses, proof of each class members' claim would be excessively individualized, causing individual questions to predominate and rendering a class action an inferior way to adjudicate each case.

### i.      Ascertainability & Predominance

As noted above, Rule 23 contains an implied ascertainability requirement that "a class be 'adequately defined and clearly ascertainable.' " *Foxhoven*, 330 F.R.D. at 206 (quoting *Sandusky Wellness Ctr., LLC*, 821 F.3d at 996). This generally requires that class members can be identified with reference to objective criteria, *see McKeage*, 847 F.3d at 998, so that Courts are " 'not [] required to resort to speculation, or engage in lengthy, individualized inquiries' " to ascertain the class. *Foxhoven*, 330 F.R.D. at 206 (quoting *Brown*, 279 F.R.D. at 496). Additionally, Rule 23(b)(3)—the form of class action pursued by Plaintiffs—requires that the common questions of law or fact for the class "predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Put another way, " 'the common- aggregation-enabling, issues in the case [must be] more prevalent or important than the non-common, aggregation-defeating, individual issues.' " *Stuart*, 956 F.3d at 560 (quoting *Tyson Foods, Inc.*, 136 S. Ct. at 1045). This requirement is not satisfied where individual questions overwhelm any common questions. *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327

F.R.D. at 256 (citation omitted).  " 'Courts will generally deny certification when the putative class is defined by class members' state of mind.' " *Littler*, 2020 WL 1861646, at *14 (quoting William B. Rubenstein, 1 Newberg on Class Actions § 3.5 (5th ed. 2019)). This is because state of mind is subjective, "leaving the determination of whether an individual is a member of the class to nothing more than that individual's 'own desires and interests.' " *Id.* (citation omitted).  So-called "mental state classes" accordingly " 'frustrate fundamental due process tenets of class action litigation by making it more difficult for a court to determine with any certainty who should receive notice [of the class], who will be bound by the judgment, and who should receive any relief obtained from the defendant.' " *Id.* (citation omitted).

Here, both the "Reluctant-Union-Member" and "Reluctant-Uninformed-Union-Member" subclasses suffer from significant ascertainability and predominance defects.

First, with respect to ascertainability, the membership of each subclass is difficult to ascertain because whether a putative class member fits within each class depends on each individual's subjective beliefs.  That is, it depends upon whether each individual was "reluctant" to join the union, and specifically, whether they did so anyway after performing a "cost-benefit" analysis between "fair share" fees and union membership, or because they purportedly were not informed of their "constitutional rights."  That determination cannot be ascertained using objective criteria.  *See McKeage*, 847 F.3d at 998.  As the *Littler* court noted, "each putative class member would have to testify as to how he or she felt about the decision whether to join the union."  2020 WL 1861646, at *11.

Moreover, for the "Reluctant-Uninformed-Union-Member" subclass, not only would each individual employee have to testify about their "reluctance"—which, as the Court discusses below, has its own problems—there is also a second individualized inquiry unique to that class: the precise information communicated to each putative class member at the time they became a union member. *Id.* at *12. As representatives for each union noted, the procedures used to offer membership to new employees are determined by each local union affiliate, and accordingly vary considerably. (*See* Gardner Dep. Tr. at 52–54 (noting that for Education Minnesota, "[t]he way in which membership is offered to potential members is determined at the local level" and each "engage[s] in their individual practices in how they approach potential members to ask them to join"); Henderson Dep. Tr. at 35–36 (noting that each AFSCME local has "their own practices and procedures" for new employee orientation).) There is no "single course of wrongful conduct" or common cause of injury for these putative class members because any assertion that such class members were not informed of their constitutional rights will necessarily depend on the unique approach taken by each individual local union affiliate to solicit employees to join. For both "Reluctant" subclasses, then, ascertaining the membership of each class will require the Court to " 'engage in lengthy, individualized inquiries' " which counsels against class certification. *Foxhoven*, 330 F.R.D. at 206 (quoting *Brown*, 279 F.R.D. at 496).

In response to these problems, Plaintiffs argue that (1) subjective beliefs can form the parameters of a class definition so long as the beliefs are capable of measurement in an objective manner; and (2) Dr. Macpherson's survey constitutes a sufficiently objective form of ascertaining members of each subclasses. (*See* Hoekman CC Reply at 16–17;

56

Piekarski CC Reply at 22–23.)  However, Plaintiffs' assertion about subjective beliefs is categorically wrong.  The Eighth Circuit has clearly held that class members need to be identified by reference to *objective* criteria.  McKeage, 847 F.3d at 998.  Moreover, the cases cited by Plaintiffs in support— *H.L. v. Matheson*, 450 U.S. 398, 401 (1981) (addressing class of minor women suffering from unwanted pregnancies who desire to terminate pregnancies); *Bellotti v. Baird*, 443 U.S. 622, 626 (1979) (addressing class consisting of unmarried minors who could give consent to abortion and did not wish to involve parents); *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 858 (5th Cir. 2004) (discussing class made up of inmates who subscribe to the "Church of Christ" faith)—do not actually address the propriety of certifying a class.  And in any event, each case involved class members' feelings about the *desired outcome of the litigation*, not class members' "remembered feelings about the past."  *Littler*, 2020 WL 1861646, at *14.

Plaintiffs' reliance on Dr. Macpherson's survey is equally unavailing.  Both Plaintiffs concede that their motion for class certification rises and falls on this survey. (*See* Hoekman CC Reply at 9 ("[P]laintiffs acknowledged from the outset that class members will need to be asked whether they would have joined and paid the union absent an agency shop."); Piekarski CC Reply at 13 (same).)  However, aside from the fact that the Court has already excluded Dr. Macpherson's opinions about such a survey, *see supra* § II(A)(4)(c), the need for such a survey itself illustrates that the "Reluctant" subclasses are not sufficiently ascertainable without highly individualized inquiries.  While surveys are not per se impermissible in a class action context, their suitability depends on the objective nature of the information being sought, along with their degree of statistical significance.

For example, the Eighth Circuit has indicated that the use of "statistically significant surveys" to identify the citizenship of putative class members is acceptable at the certification stage. *Hood v. Gilster-Mary Lee Corp.*, 785 F.3d 263, 266 (8th Cir. 2015); *see also Myrick v. WellPoint, Inc.*, 764 F.3d 662, 665 (7th Cir. 2014) (permitting plaintiffs to take a random sample of potential class members for ascertaining the citizenship of each member). Similarly, while the need to ask a single question of class members is, as the Plaintiffs note, not a bar to certification (*see* Hoekman CC Reply at 10; Piekarski CC Reply at 14, 14 n.5), in each of the cases Plaintiffs cite in support, the survey question sought information about financial information that could be objectively verified, not information about putative class members' subjective reasons for a past decision.[16]

The Seventh Circuit's decision in *Riffey v. Rauner*, 910 F.3d 314 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2745 (2019), decided after *Janus*, serves as a useful guide here,

---

[16] *See In re Paulsboro Derailment Cases*, No. 13-784 RBK/KMW, 2014 WL 4162790, at *6 (D.N.J. Aug. 20, 2014) ("[W]hether a putative class member incurred expenses or lost income due to obeying the evacuation and shelter orders is an objective inquiry...."); *Spears v. First Am. eAppraiselT*, No. 5-08-CV-00868-RMW, 2014 WL 4647679, at *19 (N.D. Cal. Sept. 16, 2014) (determining purpose of loan); *Butto v. Collecto Inc.*, 290 F.R.D. 372, 382 (E.D.N.Y. 2013) ("[I]t appears to the Court that the process of determining whether a debt is a consumer debt would be 'relatively straightforward.' "); *Edwards v. First Am. Corp.*, 289 F.R.D. 296, 305 (C.D. Cal. 2012) ("It therefore does not appear to the Court that determining the purpose of the class members' loans would be 'unmanageable.' "); *Tourgeman v. Collins v. Fin. Servs., Inc.*, No. 08-CV-1392 JLS (NLS), 2011 WL 5025152, at *7 (S.D. Cal. Oct. 21, 2011) (requiring determination of whether putative class member paid money or incurred expenses in response to a collection letter or lawsuit); *Herrera v. LCS Fin. Servs. Corp.*, 274 F.R.D. 666, 673 (N.D. Cal. 2011) (noting that class members were required to indicate the type of loan on the loan applications); *Wilkerson v. Bowman*, 200 F.R.D. 605, 610 (N.D. Ill. 2001) (determining whether debts involved were personal or business debt); *Wells v. McDonough*, 188 F.R.D. 277, 279 (N.D. Ill. 1999) (same).

both legally and factually.  In *Riffey*, the Seventh Circuit reviewed its prior decision

affirming a district court's denial of certification to a class of home health care assistants

who were seeking a refund of "fair share" fees they had paid to a union for collective-

bargaining representation.  *Id.* at 315.  Notably, prior to *Janus*, the Seventh Circuit had

affirmed the district court's finding that individual issues predominated over common

questions of law and fact.  *Id.*  The putative class representatives sought review before the

Supreme Court which, upon deciding *Janus*, vacated and remanded the Seventh Circuit's

decision back to the court for further consideration.  *Id.* at 316 (citing *Riffey v. Rauner*, 138

S. Ct. 2708 (2018)).  On remand, the Seventh Circuit affirmed its prior decision and

concluded that "*Janus* does not require a different result on the narrow question presented

in [the] appeal, namely, whether the class-action device is the proper one for the [plaintiffs]

to use in seeking refunds of fair-share fees."  *Id.* at 316.  In affirming its prior decision, the

Seventh Circuit observed that individual questions still predominated in the proposed class:

> We agree with the district court that the question whether damages are owed
> for many, if not most, of the proposed class members can be resolved only
> after a highly individualized inquiry. It would require exploration of not only
> each person's support (or lack thereof) for the Union, but also to what extent
> the non-supporters were actually injured. The Union would be entitled to
> litigate individual defenses against each member. This suggests not only that
> individual questions predominate at this stage of the litigation, but also that
> it would be difficult to manage the litigation as a class.

*Id.* at 319 (citation omitted) (internal quotation marks omitted).

Here, as in *Riffey*, there is simply no objective way to determine who is a member

of the "Reluctant" subclasses without asking each of the tens of thousands of current and

past Education Minnesota and AFSCME Council 5 bargaining-unit members their reasons

and motivation for joining the union. *Littler*, 2020 WL 1861646, at *14. The need for the survey itself illustrates the difficulty in ascertaining who is a member of the "Reluctant" subclasses.

### ii.     Problems Inherent to Dr. Macpherson's Survey

Even if the *need* for the survey was not itself illustrative of the problems with the "Reluctant" subclasses, the *nature* of the proposed survey demonstrates that individualized inquiries predominate over any common questions of law or fact, which in turn exposes the inferiority of the class action format for resolution of this matter. Dr. Macpherson plainly admits that there is no way to objectively determine what a person's attitude towards paying agency fees may be, or the reasoning behind the person's decision whether to join a union. (*See* Macpherson Dep. Tr. at 50–52, 58, 61–62, 95–96.) He also admits that he has not drafted *any* survey questions—much less questions designed to avoid biased outcomes—or a procedure for validating the results of his questions. (*Id.* at 114.)

Additionally, as the *Littler* court noted when considering an identical survey proposal, such a survey is unreliable because it "is unable to avoid problems stemming from memory, misinterpretation, or outright dishonesty." 2020 WL 1861646, at *14. With respect to memory, the Court agrees with the *Littler* court that it is unlikely that "individuals will be able to recall accurately their particular feelings at the time that they were faced with the decision whether to join the union." 2020 WL 1861646, at *15 (discussing how feelings are difficult to remember, and noting that feelings can even impact *how* individuals remember things). The Court need look no further than the "Reluctant" subclasses' putative class representatives in this case to confirm this point. Buros admits that before

she began working at the Shakopee Public Schools, she worked in South Carolina where she was not required to pay anything to a union.  (Buros Dep. Tr. at 19.)  Accordingly, upon beginning her employment in Minnesota, she was already frustrated about having to pay *anything* to the union.  (*Id.*)  And while she asserts she has always been under the impression that she was required to join the union—as opposed to just paying "fair share" fees—she now acknowledges that it was a choice, and that her own union membership card states that her agreement to pay union dues was "voluntary."  (*Id.* at 54, 57.)

Piekarski, on the other hand, openly acknowledges that he does not remember what was said at his new employee orientation (*see* Piekarski Dep. Tr. at 88), but believes—despite this apparent lack of memory—that he was not given the choice to not join the union.[17]  (*Id.* at 29.)  Yet there is reason to question his supposed "reluctance."  Not only did Piekarski join the union when he was hired, he also committed to additional monthly payments above and beyond any dues or agency fees in order to receive a union jacket and did not cancel those extra payments until January of 2013.  (*Id.* at 32–34.)  And after joining, Piekarski became president of his AFSCME local chapter, subsequently resigned,

---

[17]    It is worth noting that an independent reason that the "Reluctant-Union-Member" subclass in the *Piekarski* case cannot be certified is that the subclass lacks a named representative.  Piekarski testified that he *did not* join the union because of fair share fees. (Piekarski Dep. Tr. at 31.)  Accordingly, he could not possibly have suffered the same injury as the "Reluctant-Union-Member" subclass, which is defined as any "employees who opposed payments to the union but who reluctantly joined *because they decided that the difference between the cost of full membership dues and the mandatory 'fair-share' fees* would not have been worth the loss of their voice and vote in collective-bargaining matters."  (Piekarski CC Mem. at 1 n.1 (emphasis added).); *see East Texas Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403 (1977) ("A class representative must be part of the class and possess the same interest and suffer the same injury as the class members.").

and feels the union later treated him unfairly *because* of his former role as president. (*Id.* at 38, 44, 60.)

In short, the testimony of each putative class representative for the "Reluctant" subclasses illustrates the bias infecting a survey that seeks answers about past feelings about a decision made years (in some cases, more than two decades) ago. *See Littler*, 2020 WL 1861646, at *15 ("[T]here is no way to ensure that individuals' memories from years and even decades ago will not have been polluted by subsequent events. For example, an individual who happily joined [the union] twenty years ago may have had a falling-out with the union in the interim that may have subconsciously tainted that original decades-old memory."); *see also Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, No. 3:13-cv-2085, 2016 WL 75535, at *3 (N.D. Ohio Jan. 7, 2016) (noting that because a fax at issue was sent in 2010, "the 'recollection of a putative class member that he, she, or it had received a particular unsolicited fax would be somewhat suspect.' " (citation omitted)), *aff'd*, 863 F.3d at 460.

With respect to misinterpretation, Dr. Macpherson's only comment on what such survey questions might look like—essentially a verbatim copy of the proposed class definitions—indicates that the survey itself would likely be either vague, misleading, or both. As Dr. Macpherson noted in his report for the *Hoekman* matter:[18]

---

[18] Curiously, Dr. Macpherson offers this general overview in his report for the *Hoekman* matter—including question (a), the cost-benefit analysis basis for reluctance—despite the fact that the Hoekman Plaintiffs are *not* seeking certification of a subclass of union members who joined after evaluating the difference between "fair share" fees and dues. (*See* Hoekman CC Mem. at 1. n.1 (setting forth proposed subclasses).)

> Members can be asked whether or not they: (a) opposed payments to the
> union but joined because they decided that the difference between the cost of
> full membership dues and the mandatory "fair-share fees" would not have
> been worth the loss of their voice and vote in collective-bargaining matters;
> and/or (b) opposed payments to the union but joined because they were never
> informed of their constitutional right to decline union membership and pay a
> reduced amount in "fair-share fees."

(Macpherson Hoekman Rpt. at 7 n.3.)

Yet such questions ignore the nature of the class they seek to inform.  As the *Littler*

court noted, " '[r]eluctance' is not an objective term, and it is not something that can be

easily quantified."  2020 WL 1861646, at *15.  Dr. Macpherson's only identified survey

questions necessarily require the respondents to assume that "reluctance" can mean only

two things and that any other "reluctance" to join the union was not reluctance at all.  Put

another way, Plaintiffs' ideal survey questions improperly cage the term "reluctance" into

two arbitrary categories—categories that only benefit the Plaintiffs' lawsuits and do not

account for other possible reasons for "reluctance."  Further, they are leading questions

because they directly suggest the responses that Plaintiffs seek, which, incidentally, may

not be a response that would have otherwise occurred to the putative class members.  *See*

*E & J Gallo Winery v. Proximo Spirits, Inc.*, No. 1:10-cv-00411 LJO JLT, 2011 WL

5922090, at *4 (E.D. Cal. Nov. 28, 2011) (Thurston, Mag. J.) (noting that survey questions

that "strongly suggest[] a possibility that might not have occurred to the [respondents]" are

not neutral (citation omitted) (internal quotation marks omitted)); *Bobak Sausage Co. v. A*

*& J Seven Bridges, Inc.*, No. 07 C 4718, 2010 WL 1687883, at *8 (N.D. Ill. Apr. 26, 2010)

(finding survey questions that directly suggested the answer that Plaintiffs wanted were

"skewed to obtain a desired result"); *CKE Rest. v. Jack in the Box, Inc.*, 494 F. Supp. 2d

1139, 1144–45 (C.D. Cal. 2007) (concluding survey question was "leading and suggestive" because they "provid[ed] the [respondents] with the suggested response," essentially "beg[ging] the results that Plaintiffs ultimately received" and "increase[ing] the likelihood of biased results").

Finally, "it cannot be ignored that survey respondents may be untruthful in their answers" to Dr. Macpherson's proposed survey because "[t]hey have a financial incentive to lie given that a particular answer carries with it the prospect of sharing in a monetary settlement or award." *Littler*, 2020 WL 1861646, at *15. Similarly, "for those ideologically opposed to [their union], there is an ideological incentive to lie in order to join a lawsuit that may result in weakening the union." *Id.* And, as Dr. Macpherson admits, there is no objective way to evaluate whether respondents are honestly answering the survey questions because there is no way to objectively determine what a person's attitude towards paying agency fees may be, or the reasoning behind that person's decision to join or not join a union. (*See* Macpherson Dep. Tr. at 50–52, 58, 61–62, 95–96.) And while the unions could try to discredit various putative class members' survey answers, doing so would require "massive amounts of individualized discovery and investigation to try and verify the truthfulness of [the putative class members'] statements." *Littler*, 2020 WL 1861646, at *15. Accordingly, even using Dr. Macpherson's survey, each case would still " 'break down into an unmanageable variety of individual legal and factual issues,' " *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. at 257 (citation omitted), causing " 'individual questions . . . [to] overwhelm the questions common to the class.' " *Id.* at 256 (quoting *Ebert*, 823 F.3d at 478–79).

In summary, the "Reluctant" subclasses cannot be certified because their membership cannot be ascertained through objective criteria, and because individualized issues will predominate, rendering each case ill-suited for the class action format. Accordingly, Plaintiffs' motions for certification of "Reluctant" subclasses are denied.[19]

### c.     The "Resignation" Classes

The Court now turns to the proposed "Union Resignation" class in *Hoekman*, and the "Membership Resignation" class in *Piekarski*.   Each class is essentially the same, encompassing employees in bargaining units represented by Education Minnesota or AFSCME Council 5 who, after *Janus*,[20] communicated their desire to resign from the union yet still had membership dues diverted from their paychecks after resigning.   (*See* Hoekman CC Mot.; Piekarski CC Mot.)

As an initial matter, the Court notes that these two classes differ from the classes and subclasses discussed above because the membership of each class is objectively

---

[19]     The Court also denies Piekarski's other (unargued) request for certification of a subclass consisting of members of both the "Reluctant-Union Member" and "Reluctant-Uninformed-Union-Member" subclass (*see* Piekarski CC Mem. at 1 n.1), as such a class would suffer from the same defects noted above.

[20]     Notably, the "Union Resignation" class set forth in the Hoekman Plaintiffs' Motion for Class Certification does not limit the class to individuals who resigned from the union after *Janus*.   (*See* Hoekman CC Mot.)   However, the Hoekman Plaintiffs' Amended Complaint and Memorandum in Support of Class Certification both refer to the class as being limited to post-*Janus* resignations.   (*See* Hoekman Am. Compl. at p. 2; Hoekman CC Mem. at 15–16.)   Importantly, in their oral argument before the Court, the Hoekman Plaintiffs asserted that the class consisted of individuals who resigned from the Union in the aftermath of *Janus*.   As such, the Court construes the Hoekman Plaintiffs' "Union Resignation" Class as being limited to former Education Minnesota members who resigned *after* the Supreme Court's decision in *Janus*.

ascertainable based on union records and paycheck dues deductions; no inquiry into subjective "reluctance" is required.  *See McKeage*, 847 F.3d at 998 (requiring class members to be identifiable via objective criteria).  Moreover, the Court does not see any intra-class conflicts inherent in the class membership.  All putative class members in the "Resignation" classes necessarily sought to cease *all* financial support to the unions by resigning after *Janus*; they were not required to contribute dues or "fair share" fees to their union.  Accordingly, the Court turns to the other requirements of Fed. R. Civ. P. 23(a) and 23(b)(3).

### i.      "Union Resignation" Class (*Hoekman*)

The Court first addresses the "Union Resignation" class for the *Hoekman* matter. While the Court concludes that the Hoekman Plaintiffs have satisfied the requirements of Rule 23(a) with respect to the class, it holds that they have *not* satisfied the predominance requirements of Rule 23(b)(3).  Accordingly, the Court denies the Hoekman Plaintiffs' Motion for Class Certification with respect to the "Union Resignation" class.

### a.      Numerosity

In support of numerosity, the Hoekman Plaintiffs assert that "well over 40 employees have dropped their [Education Minnesota] membership in the wake of *Janus*" and that each one of those employees would have had membership dues taken from their paychecks unless and until they opted out of payroll deductions during the "union-imposed window" for resigning.  (Hoekman CC Mem. at 15 n.15.)  They rely on data produced by Education Minnesota in discovery showing that 647 union members dropped their membership during the 2018 to 2019 school year, the first school year after *Janus*,

66

compared to only 62 who dropped their membership in the prior year.  (*Id.* (citing Gardner Dep. Tr. at 16–17 & Dep. Ex. 2)).)

In response, Education Minnesota notes that just because those members dropped their membership after *Janus* does not mean that many or even most of them paid post-resignation dues.  (Education MN CC Opp'n Mem. at 38.)  It offers the Declaration of Robert Gardner—Education Minnesota's Manager of Field Services—in support.  (*See* Gardner Decl. ¶¶ 1–2.)  Gardner, who is familiar with the membership records of Education Minnesota (*Id.* ¶ 2), states that after *Janus*, 54 members sought to resign their union membership and stop paying dues *prior* to the annual dues' deduction authorization revocation window in late September 2018.  (*Id.* ¶ 29.)  Of those individuals, 49 employees did not have any dues deducted after they revoked their dues authorizations because most locals had already stopped collecting dues for the 2017–2018 school year, and did not resume collection until after the late-September 2018 revocation window.   (*Id.*)  Accordingly, only five people who resigned from union membership after *Janus*, but before the 2018–2019 revocation window, had dues deducted from their paychecks in September 2018.  (*Id.* ¶ 30.)  Yet Education Minnesota has already mailed refunds, plus interest, to four of those five people; the only one who has not accepted a refund is Buros, to whom the refund offer was communicated in the form of a settlement offer in this litigation, and to which no response was provided.  (*Id.*)

After the September 2018 revocation window, 29 employees sought to revoke their dues authorizations during the 2018–2019 school year, but before the beginning of the September 2019 revocation window.  (*Id.* ¶ 32.)  Dues deductions for those employees

continued in accordance with the terms of their membership agreements. (*Id*.) And for the 2019-2020 school year, Education Minnesota is aware of only three people who have requested or inquired about revoking dues outside the revocation window, and whose dues payments have continued. (*Id.* ¶ 33.) As such, according to Education Minnesota's records, the "Union Resignation" class has at most 33 members: one from the period of time between *Janus* and the September 2018 revocation window, 29 from the period of time between the September 2018 revocation window and the September 2019 revocation window, and three from the September 2019 window until now.

The Hoekman Plaintiffs respond that this number does not take into account the individuals who communicated their desire to quit the union, but not their desire to terminate payroll deductions. (Hoekman CC Reply at 21–22.) They assert that "[a]n employee can resign from the union without submitting a request to terminate payroll deductions" particularly if they "believe that a request would be futile given language in the union-membership application." (*Id.*) Their class, they argue, is "not limited to those who had dues taken after communicating their desire to revoke payroll deductions," but rather includes anyone who communicated "*their desire to quit the union.*" (*Id.* at 22 (emphasis in original).)

The Court finds that numerosity has been satisfied for the *Hoekman* "Union Resignation" class. Education Minnesota has established that at a minimum, the *Hoekman* "Union Resignation" class contains approximately 33 members. While it is true that within the Eighth Circuit, a class size of forty or more is generally present before numerosity is presumed, *see George*, 2015 WL 5255280, at *3, the Eighth Circuit has also stated that

"[n]o arbitrary rules regarding the necessary size of classes have been established," *Paxton*, 688 F.2d at 559 (citation omitted), and has affirmed classes with as few as twenty members, *see Arkansas Educ. Ass'n v. Board of Educ. of Portland, Ark. Sch. Dist.*, 446 F.2d 763, 765–66 (8th Cir. 1971). The Court sees no meaningful distinction between a 33-member class and a 40-member class in this case. Moreover, the Hoekman Plaintiffs' assertion that the Gardner declaration does not account for a group of former union members who resigned from the union but did not communicate any desire to discontinue dues payments to the union is an important consideration. The Gardner Declaration does use different terminology that renders this issue somewhat unclear. When discussing the time period between *Janus* and the September 2018 revocation window, Gardner's data encompasses individuals who *requested to resign their union memberships and stop paying dues*, but his testimony about the time period between the September 2018 and September 2019 revocation windows only discusses individuals who sought to revoke their dues payroll deduction authorizations. (Gardner Decl. ¶¶ 29–32.) The Court considers that difference important; it is possible that some union members resigned their union membership without requesting that their dues payments stop, for any number of reasons. Accordingly, the class could be significantly larger than 33 people, and there is no requirement that the number of class members be known with minute precision at this stage. *See Pollard v. Remington Arms Co., LLC*, 320 F.R.D. 198, 206 (W.D. Mo. 2017) (finding numerosity requirement satisfied even where number of class members was uncertain, though presumably large).

### b.   Commonality

In support of commonality, the Hoekman Plaintiffs assert that there are several questions of law common to the "Union Resignation" class members, such as, for example: (1) whether public-sector unions may prohibit union members from terminating payroll deductions—even after resigning their union membership—unless they do so during a revocation window once per year; (2) whether class members are contractually barred from recovering or resigning from the union; and (3) whether "maintenance of dues" contracts, which obligate union members to pay monthly dues for a set period of time until their next revocation window, are enforceable in light of *Janus*.  (Hoekman CC Mem. at 15–16 (listing other questions).)   Education Minnesota does not appear to respond to these contentions, and does not offer any argument on commonality.

The Court finds that commonality has been satisfied for the Union Resignation class.  The Hoekman Plaintiffs needed to show that their claims depended on a "common contention" that is capable of classwide resolution in such a way that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350.  They have done so.  The putative class members' claims present one purported injury: continued dues payments despite the employees' post-*Janus* resignation from the union.  (*See* Hoekman CC Mot.; Hoekman CC Mem. at 15–16.)  Resolving whether that is in fact an injury capable of remedy requires resolution of several common legal questions highlighted by Plaintiffs above.  To the extent there are slight factual differences in each putative class members' situation, the Eighth Circuit has noted that "commonality is not required on *every* question raised in a class action."  *DeBoer v.*

70

*Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995), *cert. denied*, 517 U.S. 1156 (1996). Rather, commonality is present when the legal question " 'linking the class members is substantially related to the resolution of the litigation.' " *Id.* (quoting *Paxton*, 688 F.2d at 561). In light of the legal questions noted above, that requirement is met here.

### c. Typicality & Adequacy of Class Representative

The Hoekman Plaintiffs assert that Buros' claim is typical of her fellow putative class members because she is also seeking to recover money that "the union took despite [her] post-*Janus* resignation[] from union membership." (Hoekman CC Mem. at 16.) They also contend that Buros is an adequate class representative because there is "no conceivable divergence of interest between [herself] and her fellow employees who had their paychecks tapped after resigning their union membership." (*Id.*)

In response, Education Minnesota contends that Buros is "neither typical nor adequate" for three reasons: (1) Buros belonged to a local Education Minnesota affiliate that began dues deductions one month earlier in the school year than most local union affiliates, meaning her unique situation is shared by only four other former Education Minnesota members; (2) Buros—who resigned *before* the first revocation window following *Janus*—differs from former members who resigned *after* the first resignation window following *Janus*; and (3) Buros' claim that she joined the union because she was misled into believing she had no choice differs from other union members who understood they had a choice, which presents different legal questions. (Education MN CC Opp'n Mem. at 40–41.) In reply, the Hoekman Plaintiffs contend that none of these reasons show

a lack of typicality or inadequacy of representation, and that even assuming all those points are true, it "do[es] not affect [Buros or the putative class members] entitlement to relief[.]" (Hoekman CC Reply at 23.)

The Court finds that typicality and adequacy of representation have been met here. As the Eighth Circuit has noted, "[t]he burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer*, 64 F.3d at 1174 (citing *Paxton*, 688 F.2d at 562). Accordingly, "[f]actual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern*, 84 F.2d at 1540. Here, Buros claims the same injury as every other putative class member within the "Union Resignation" class: Education Minnesota's continued collection of dues payments, post-*Janus*, after she indicated her desire to resign from the union. (*See* Buros Dep. Tr. at 83–87.) The fact that Buros' purportedly unlawful dues collection occurred prior to most of the other class members' unlawful dues collection has no bearing on the claimed injury; it still arose when she requested to resign after *Janus.* Similarly, the fact that Buros resigned post-*Janus* but *before* the first revocation window following *Janus* does not render Buros differently situated. Each claimed deviation reflects only a slight difference in *when* Buros suffered the same typical injury suffered by other putative class members. Finally, the fact that Buros purportedly joined her local union affiliate because she believed she lacked a choice—a decision made approximately 22 years ago (*see* Buros Dep. Tr. at 57)—does not diminish typicality (although it does impact predominance, as discussed below) because the basis for her decision to join the union does

not alter the fact that her asserted injury is typical of the putative class members. Finally, with respect to adequacy of representation, there is no evidence in the record that Buros lacks a common interest with members of the class based on their shared injury, or that she will not "vigorously prosecute" the class' interests. *See Medtronic, Inc.*, 325 F.R.D. at 286–87 (citing *Paxton*, 688 F.2d at 562–63). To the contrary, she has indicated an express interest in representing the class. (*See* Buros Dep. Tr. at 136.)

### d.       Predominance & Superiority

Turning to Rule 23(b)(3) predominance and superiority requirements, the Hoekman Plaintiffs assert that the "many common legal questions" noted above "will predominate over questions affecting only individual members." (Hoekman CC Mem. at 16.) And while the amount of recovery will vary from employee to employee, the Hoekman Plaintiffs assert, such variation does not destroy predominance. (*Id.* (citations omitted).) Moreover, the Hoekman Plaintiffs contend that any recovery differences do not undermine the superiority of the class action format because any variation in recovery amount can be determined using union records. (*Id.* at 16–17.)

In response, Education Minnesota asserts that individualized issues predominate over any common questions of law or fact because "[s]ome [putative class members] (like Buros) may claim that they did not validly consent to membership agreements because they (wrongly) believed membership was mandatory. Others may claim that they would not have signed membership agreements if non-members had not been required (pre-*Janus*) to pay fair-share fees." (Education MN CC Opp'n Mem. at 42.) Such claims, Education Minnesota asserts, "require proof of subjective motivations" which, considered alongside

possible differences in how individuals communicated their desire to quit the union, indicates that individualized issues will predominate.  (*Id.* (citation omitted).)

The Court finds that the Hoekman Plaintiffs have failed to establish predominance and superiority under Rule 23(b)(3) for the Union Resignation class.  While it is true that the success of the class in part depends upon the resolution of a common legal question—namely, whether a public-sector union may lawfully continue collecting dues payments, post-*Janus*, from employees who have expressed a desire to resign from the union—the Supreme Court made clear in *Janus* that this question boils down to whether "[b]y agreeing to pay" through their membership agreements, "non-members [] waiv[ed] their First Amendment rights[.]"  138 S. Ct. at 2486 (citations omitted).  Indeed, the Court noted that "[u]nless employees clearly and affirmatively consent before any money is taken from them, this standard cannot be met."  *Id.*  Such consent must be "freely given and shown by 'clear and compelling' evidence."  *Id.* (citations omitted).

Because each of the putative class members in the Union Resignation class were already members when *Janus* was decided, the resolution of this legal issue as to the Hoekman Plaintiffs necessarily requires consideration of whether each class members' membership agreement constitutes, for that particular class member, clear and compelling evidence of a voluntary, valid waiver of that class member's First Amendment rights.  That, in turn, requires consideration of a veritable host of individualized issues, such as the circumstances under which membership was offered to and accepted by each class member, whether class members were coerced into joining, and whether the union misrepresented whether employees were required to join as a condition of their

employment.[21]   This is particularly true where some former Education Minnesota members, like Buros herself, may assert that they never voluntarily consented to pay membership dues in the first place because they were never informed by their local union affiliate that they had a choice.  (*See* Buros Dep. Tr. at 45–46, 50–51.)  And while a class may be certified based on common issues even if some important matters, such as damages or individual defenses, have to be tried separately, *see Stuart*, 910 F.3d at 375 (citation omitted), where each putative class members' entitlement to a remedy depends on facts specific to each class member, " 'the common, aggregation-enabling, issues in the case' " are simply *not* "more prevalent or important than the non-common, aggregation-defeating, individual issues.' "  *Id.* (quoting *Tyson Foods, Inc.*, 136 S. Ct. at 1045).  That is precisely the case here, and accordingly, the predominance requirements of Rule 23(b)(3) are not satisfied.

In sum, while the Court finds that the Hoekman Plaintiffs have met the requirements of Rule 23(a) for their "Union Resignation" class, they have failed to meet the predominance and superiority requirements of Rule 23(b)(3).  Accordingly, the Court denies the Hoekman Plaintiffs' Motion to Certify the "Union Resignation" class.

### ii.    "Membership Resignation" Class (*Piekarski*)

The Court next addresses the "Membership Resignation" class for the *Piekarski* matter.  As the Court explains below, Piekarski has failed to establish that his claim is

---

[21]    Notably, courts around the country appear to have uniformly rejected most of these claims, and have upheld pre-*Janus* membership agreements as voluntary, valid waivers of the First Amendment rights recognized in *Janus*.  *See Anderson v. Serv. Empls. Int'l Union Local 503*, 400 F. Supp. 3d 1113, 1116–18 (D. Or. 2019) (collecting cases).

typical of the class he seeks to represent, or that he is an adequate class representative for the proposed "Membership Resignation" class.  Consequently, Piekarski has failed to meet the requirements of Rule 23(a).  Moreover, even assuming that the requirements of Rule 23(a) were met, Piekarski has failed to satisfy the predominance requirements of Rule 23(b)(3).  Accordingly, the Court denies Piekarski's Motion for Class Certification with respect to the "Membership Resignation" class.

### a.      Numerosity

In support of numerosity, Piekarski contends that it is "undisputed that over 40 public employees have attempted to drop their union membership and were denied," resulting in each of them having had membership dues taken from their paychecks "against their will."  (Piekarski CC Mem. at 13 n.13, 13–14.)  Piekarski relies on data produced by AFSCME Council 5 showing that in 2018, there were 84 AFSCME Council 5 members who requested to withdraw from and cease paying dues to the union, but who were denied withdrawal and who continued to pay dues.  (Henderson Dep. Tr. Ex. 2 at Doc. P. 70.) There were 36 individuals meeting that same criteria in 2019.  (*Id.*)  AFSCME Council 5 does not dispute this data, nor does it dispute that numerosity is satisfied.  (*See generally* AFSCME CC Opp'n Mem. at 36–37.)  Accordingly, given the undisputed evidence, the Court finds that there are approximately 120 putative class members in the "Membership Resignation" class.  Moreover, the Court holds that joinder of all 120 members would be impracticable, and that accordingly, numerosity is satisfied.  *See Paxton*, 688 F.2d at 559.

### b.      Commonality

Piekarski asserts the same common questions of law or fact as the Hoekman Plaintiffs in support of commonality such as, for example, whether public-sector unions may prohibit union members from terminating payroll deductions—even after resigning their union membership—unless they do so during an opt-out window once per year, and whether class members are contractually barred from recovering or resigning from the union.  *See supra* § II(B)(2)(c)(i)(b).  AFSCME Council 5 does not appear to contest commonality, and in any event, the Court finds that the same common questions of law or fact set forth above for the "Union Resignation" class in *Hoekman* exist for the "Membership Resignation" class in *Piekarski*.  *See supra* § II(B)(2)(c)(i)(b).

### c.      Typicality & Adequacy of Class Representative

Piekarski asserts that his claim, as class representative of the "Membership Resignation" class, is typical of the putative class members' claims because he, like them, is "seeking to recover money that the union took despite their resignation from union membership."  (Piekarski CC Mem. at 14.)  Moreover, Piekarski also contends that he is an adequate class representative because there is "no conceivable divergence of interest between [himself] and his fellow employees who had their paychecks tapped after resigning their union membership."  (*Id.*)

In response, AFSCME Council 5 argues that Piekarski's claims are *not* typical of the class because unlike 91% of AFSCME Council 5 members, Piekarski has not signed a contract that contains a "maintenance of dues" membership provision committing him to

pay dues for renewing one-year periods of time, revocable only during certain revocation periods tied to the date the member signed their membership contract.  (AFSCME CC Opp'n Mem. at 36–37.)  Because Piekarski has not signed such an agreement, and because the "common questions" Piekarski identifies primarily relate to the impact *Janus* has on such agreements, AFSCME Council 5 contends that resolving Piekarski's claims will not resolve, or even implicate, the same legal questions as the rest of the class.  (*Id.* at 37.)

Piekarski replies that typicality does not require that his claims be identical to the putative class members' claims; rather, they need only arise from the same event or course of conduct, or be based on the same legal or remedial theory.  (Piekarski CC Reply at 24 (citations omitted).)  Piekarski's claim "arises from the same event or course of conduct as the claims of her (sic) fellow class members," namely, that "they all arise from the union's unwillingness to allow members to terminate dues deductions upon resigning from the union."  (*Id.* at 25.)  He also asserts that the claims are based on the same legal theory: that "*Janus* forbids a public-sector union to take membership dues from a non-member's paycheck unless he 'clearly and affirmatively consents before any money is taken from [him].' "  (*Id.* (quoting *Janus*, 138 S. Ct. at 2486).)

The Court finds Piekarski has failed to show that his claim is typical of the class members he seeks to represent, and that he is an inadequate class representative.  With respect to typicality, Piekarski's claims did not arise from the same event or course of conduct as the claims of his fellow putative class members because Piekarski signed a different contract than the vast majority of AFSCME Council 5 members.  Unlike 91% of AFSCME Council 5 members, Piekarski's membership contract does *not* contain a

"maintenance of dues" provision.  (*Compare* Henderson Dep. Tr. Ex. 5 at Doc. P. 73 (membership contract with maintenance of dues provision), *with* Piekarski Dep. Tr. Ex. 6 at Doc. P. 115 (Piekarski membership contract without maintenance of dues provision); *see also* Henderson Dep. Tr. at 44.)  Accordingly, Piekarski's entitlement to a refund will rest on different questions of contract law—such as whether the language of his membership agreement even permits continued dues payments once the member resigns (*see* Piekarski Dep. Tr. Ex. 6 at Doc. P. 115 (containing no language requiring written revocation of dues authorization))—unrelated to the enforceability of a maintenance of dues provision, which will be an issue crucial to resolving the majority of the putative class members' claims.[22]  *See Duchardt*, 265 F.R.D. at 445 (holding typicality requirement not satisfied where named plaintiff signed different contract than a large percentage of putative class members).

Beyond his non-typical claim, Piekarski is also not an adequate class representative because he is not a member of the "Membership Resignation" class.  Unlike the putative class members, Piekarski sought to resign his union membership *before* the Supreme Court decided *Janus*.  (*See* Piekarski Dep. Tr. at 52 (noting he sought to resign membership in October of 2017).)  Yet Piekarski's Motion for Certification defines the "Membership Resignation" class as including only employees in AFSCME Council 5 bargaining units who informed the union they wished to terminate dues *after* the *Janus* decision.  (Piekarski CC Mot.); *see also East Texas Motor Freight Sys.*, 431 U.S. at 403 ("A class representative

---

[22]    Notably, Piekarski has offered no evidence establishing how many "Membership Resignation" putative class members signed either type of contract.

must be part of the class and possess the same interest and suffer the same injury as the class members."). And while Piekarski certainly communicated with AFSCME Council 5 after *Janus* about resignation, he did so in relation to his October 2017 resignation request. (*See* Piekarski Dep. Tr. Ex. 11 at Doc. P. 158–67.) In fact, Piekarski openly seeks a refund of dues he paid following his resignation as president of Local 221 in 2015 (*see id.* at 17, 22–23), three years prior to the cut-off date of his own class.

As such, the Court finds that Piekarski has not established that his claims are typical of the "Membership Resignation" putative class members' claims, or that he is an adequate class representative for the class.

### d.   Predominance and Superiority

Even assuming the typicality and adequacy of representation requirements of Rule 23(a) were met for the "Membership Resignation" class (they are not), Piekarski failed to establish that the questions of law or fact common to the class predominate over individualized issues, as required by Rule 23(b)(3). Much like the Hoekman Plaintiffs, Piekarski asserts that the "many common legal questions" he identifies "will predominate over questions affecting only individual members." (Piekarski CC Mem. at 14.) While the amount of recovery will vary from employee to employee, Piekarski contends, such variation does not destroy predominance. (*Id.* at 14–15 (citation omitted).) And, he argues, any recovery differences do not undermine the superiority of the class action format because the varying amounts can be determined using union records. (*Id.* at 15.) AFSCME Council 5 does not appear to argue against predominance. (*See generally* AFSCME CC Opp'n Mem. at 36–38.)

The Court finds that Piekarski's "Membership Resignation" class suffers from the same individualized issues that prevented the "Union Resignation" class from satisfying Rule 23(b)(3)'s predominance requirements.  Because Piekarski's class is limited to employees who were already members of AFSCME Council 5 prior to *Janus*, the resolution of the core legal issue as to the "Membership Resignation" class necessarily requires consideration of whether *each and every* class members' membership agreement constitutes, for that particular class member, clear and compelling evidence of a voluntary, valid waiver of that class member's First Amendment rights.  *See Janus*, 138 S. Ct. at 2486. Put simply, each putative class members' entitlement to a remedy will " 'break[] down into an unmanageable variety of individual legal and factual issues[,]' " rendering Rule 23(b)(3) predominance requirement unsatisfied.  *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 327 F.R.D. at 256 (quoting *Nobles*, 2013 WL 12153517, at *2); *see also supra* § II(B)(2)(c)(i)(d) (explaining the various legal questions that must be determined on a class-member specific basis).

In sum, the Court finds that Piekarski has not met the typicality and adequacy of representation requirements of Rule 23(a), nor has he met the predominance and superiority requirements of Rule 23(b)(3).  Accordingly, the Court denies Piekarski's Motion to Certify the "Membership Resignation" class.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motions for Class Certification (18-cv-01686 [Doc. No. 91]; 18-cv-02384 [Doc. No. 58]) are **DENIED**, and Defendants' Motions to Exclude

Expert Testimony (18-cv-01686 [Doc. No. 101]; 18-cv-02384 [Doc. No. 72]) are

**GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**


Dated: May 27, 2020                     s/Susan Richard Nelson
                                        Susan Richard Nelson
                                        United States District Judge